LANGE and wife, Respondents, vs. HECKEL and another, Appellants.

*November 6, 1919—March 9, 1920.*

*Conspiracy: Sufficiency of evidence: Degree of proof required: Circumstantial evidence proper: Proof of express agreement to defraud unnecessary: Not necessary to set out in verdict steps by which purpose was accomplished: Error to admit adverse examination as deposition: Appeal: Evidence construed in favor of party securing verdict: Erroneous admission of adverse examination: Harmless error: Instructions on immaterial issue.*

1. In an action to recover damages resulting from a conspiracy to defraud, the evidence is *held* sufficient to support the jury's special verdict that two or more of the defendants had conspired to defraud plaintiffs through the exchange of real property.

2. To support an affirmative answer to the question whether defendants conspired to defraud, plaintiffs must establish the truth thereof by clear and satisfactory evidence to a reasonable certainty.

3. Proof of conspiracy almost *ex necessitate* must rest upon circumstantial evidence, direct proof of the illegal combination being generally locked within the breasts of the conspirators, so that the ultimate fact of the corrupt agreement must be inferred from established facts and circumstances. An express agreement between the defendants to defraud plaintiffs is not necessary, a tacit understanding to defraud being sufficient.

4. Upon an appeal from a judgment for plaintiff the evidence must be given every legitimate construction most favorable to his contentions.

5. The adverse examination of a party to an action under sec. 4096, Stats., is to enable the other party to obtain evidence, and is not the taking of a deposition to be used as evidence on the trial; and such evidence is not admissible when offered by the party testifying, although admissible when offered by the opposite party as evidence of admissions against interest.

6. Where the adverse examination of a party was wrongly admitted as his deposition, and he subsequently testified, and appellants had full opportunity of cross-examination but did not show any discrepancy between the testimony and deposition, the error was harmless.

7. It was not necessary that the jury in rendering a verdict against defendants should state whether they found them guilty of fraud in inducing the intoxication of plaintiffs, or for other reasons, where the conspiracy for which they were convicted was one to defraud.

8. Where four questions in a special verdict, if answered in plaintiffs' favor, made a case against the defendants, and a fifth question which was submitted had no place in the special verdict, the question whether the court properly instructed the jury in submitting such fifth question will not be considered.

9. Appellants are in no position to question the amount of damages allowed, where the record shows that such amount was practically agreed upon in open court by the attorneys for all parties.

ESCHWEILER, J., dissents.

APPEALS from a judgment of the municipal court of Brown county: N. J. MONAHAN, Judge. *Affirmed.*

Action to recover damages resulting from a conspiracy.

The following facts are undisputed: The plaintiffs are hus-
band and wife, of Polish nationality, unsophisticated in
business transactions, speak the English language poorly
and write it not at all.    They owned a little forty-acre farm,
situated about a mile from the village of Pulaski, which had
been their home for a number of years.    The defendant
*Heckel* owned a two-story frame building in the village of
Pulaski.    For some time prior to the 21st day of June,
1915, this property had been listed with the defendant
Dominiczak, a real-estate agent, for sale without success.
On the morning of the said 21st day of June, *Heckel* told
Dominiczak that if he did not dispose of the property that
day he would place it in the hands of another real-estate
agent.    Dominiczak determined to trade the property for
the Lange homestead, and called to his assistance the de-
fendant *Passowicz,* who lived on a farm between three and
four miles from Pulaski and at times worked with Domin-
iczak in making real-estate deals.    About 3 o'clock in the
afternoon Dominiczak drove out to the Lange homestead.
*Mrs. Lange* was at Pulaski.    He talked with *Lange* about a
trade of the farm for the store property.    *Lange* went to
Pulaski with him.    They met *Passowicz* and went into a
saloon and had one or two drinks of whisky.    *Mrs. Lange*
was found and they examined the store building.    *Heckel*
joined the party and they talked trade.    *Lange* said he would
trade his farm, machinery, and personal property for the
store building and $1,000 to boot.    The five got into an
automobile and went out to the farm, ostensibly to look
over the personal property.    At least four quart bottles of
beer were taken along.    The beer was consumed, the details
of a trade talked over, a notary public was brought from
Pulaski, and he prepared a contract by the terms of which
the *Langes* were to trade the farm for the store property
and $500 to boot.    The deal was to be completed in thirty
days, and if either party breached the contract $500 was to
be paid to the other.    To secure the payment of the $500

the *Langes* executed their note for that amount payable to Dominiczak and *Passowicz*. All papers were signed by the *Langes* by their marks. That night *Mrs. Lange* was so sick as the result of drinking the beer that a doctor had to be called. In the morning, after reading the contract, *Lange* immediately went to Pulaski and took the train for Green Bay to see a lawyer. Dominiczak, learning of this, hastened to Green Bay to see the lawyer (whom he knew *Lange* would consult) before *Lange* reached him. The lawyer declined to give *Lange* any advice and *Lange* returned home. Soon after his return home Mrs. Passowicz, wife of defendant *Passowicz*, called at the Lange place, and soon thereafter *Heckel* and Dominiczak drove up. They demanded immediate payment of the $500, threatened to sue the *Langes* if it was not paid, and threatened them with loss of their farm. After much discussion, a notary public was again brought out from Pulaski. *Lange* and his wife executed their note to *Heckel* for $300, secured by mortgage on the farm, and all papers previously executed were destroyed. *Heckel* sold the note and mortgage to the Seymour State Bank and divided the proceeds with Dominiczak and *Passowicz,* the latter receiving $70. Upon the maturity of the note foreclosure proceedings were instituted by the Seymour State Bank, which the *Langes* settled by giving a new note and mortgage for $469.

As already stated, the above facts appear without dispute. In addition to these facts the *Langes* claimed that the defendants represented that the store building at Pulaski rented for $35 per month. It is conceded that it did not rent for such amount, but defendants deny having made the representation. The *Langes* further claimed that they never agreed to trade for $500 to boot; that that provision of the contract was never agreed to by them, but was surreptitiously inserted. They further claimed that they never agreed to pay $500 in case of their failure to fulfil the con-

tract, and that they did not know that they were signing a $500 note to Dominiczak and *Passowicz*. They also claimed that they were so intoxicated by reason of drinking the beer and whisky furnished by the defendants that they were incapable of transacting business and did not know what they were doing.

The jury returned the following special verdict:

(1) That the defendants *Passowicz,* Dominiczak, and *Heckel* conspired to defraud plaintiffs; (2) that the defendants in carrying out said conspiracy secured from the plaintiffs the land contract in question; (3) that the defendants in carrying out said conspiracy and in furtherance of it secured from the plaintiffs the $300 note and mortgage in question; and (4) that the giving of the $300 note and mortgage in question was not agreed upon by the plaintiffs as a settlement in full of this cause of action.

Upon this verdict judgment was rendered in favor of the plaintiffs and against the defendants for the sum of $469, and from that judgment the defendants *Passowicz* and *Heckel* appealed. Dominiczak did not appear in nor defend the action.

*Sol. P. Huntington* of Green Bay, for appellant *Heckel*.

A brief was also filed for the appellant *Passowicz* by *Kaftan & Reynolds* of Green Bay.

For the respondents there was a brief by *Martin, Martin & Martin,* and oral argument by *Gerald F. Clifford,* all of Green Bay.

The following opinions were filed January 13, 1920:

OWEN, J. It is the major contention of appellants that the verdict is not supported by the evidence. The gist of the action is embodied in the first question of the special verdict, by which the jury found that two or more of the defendants conspired to defraud plaintiffs by securing the land contract in question. The answer to this question was

pursuant to an instruction that the burden of proof to support an affirmative answer was upon the plaintiffs to establish the truth thereof by clear and satisfactory evidence to a reasonable certainty.   In view of the fraudulent object of the conspiracy, this was a correct statement of the degree of proof required of plaintiffs to establish their cause of action. Appellants challenge the sufficiency of the proof tested by this rule.   The record has been examined with care, and we are satisfied that the conclusion of the jury is neither rash nor hazardous, but, on the contrary, is a very natural inference to draw from all the facts and circumstances disclosed by the evidence.   We scarcely need refer to the fact that proof of conspiracy almost *ex necessitate* must rest upon circumstantial evidence.   Conspiracy is a line of endeavor the success of which is not promoted by advertising. Direct proof of the illegal combination is generally locked within the breasts of the conspirators, and the ultimate fact of the corrupt agreement, if proved at all, must be inferred from established facts and circumstances.

Examining the facts and circumstances supported by the evidence, we find that the defendant *Heckel* was the owner of a store building in the village of Pulaski, in a more or less precarious state of repair and usefulness.   He had been wanting to dispose of the property for some time, and had it listed for sale with the defendant Dominiczak, a real-estate agent, without results.   Suddenly, on the morning of June 21st, so the evidence goes, *Heckel* told Dominiczak that if he did not sell or trade the property that day he would place it in the hands of another agent.   This was a rather peremptory and brusque ultimatum, in view of the fact that there is a limited clientele for village property of this character.   However, Dominiczak accepted the challenge and got busy.   He laid his plans for an intensive campaign. The Lange farm was his objective.   *Lange* had never manifested a desire or disposition to trade his farm, the only kind of property he had real use for, for a run-down village

Lange v. Heckel, 171 Wis. 59.

store building for which he had no use whatever.    But the
redoubtable Dominiczak was not dismayed.    He laid out
his campaign.    He called *Passowicz* to his assistance.
*Passowicz* was a farmer living between three and four miles
from Pulaski.    He sometimes dickered in real estate and
had helped Dominiczak in a few deals.    Dominiczak needed
his help then.    *Passowicz* testified: "Dominiczak told me
to come in.    He told me '*Heckel* was going to trade the
store.'    He says: 'I have a nice little farm;' and he told me
*Lange's* place."    The record is silent as to the greeting
extended *Passowicz* upon his arrival at Pulaski, or as to·
·what instructions he received from Dominiczak; or the com-
mission with which he was invested in carrying out the
plan of campaign.    That he was to play a responsible and
important part in the offensive activities, however, may be
inferred from the fact that he expected $75 for his day's
work and was subsequently paid $70.    We can judge of the
plan of campaign agreed upon only by the subsequent hap-
penings of the day.    It seems that it contemplated an
offensive against the Lange farm and, by a skilful deploying
and arranging of forces, such an investment thereof as to
compel the beleaguered ones to capitulate upon terms to be
dictated by the offensive forces.    Along in the afternoon,
while *Mrs. Lange* was "down town," Dominiczak, casually
like, dropped out to the Lange farm.    He found *Lange*
alone.    In due course a trade was suggested.    *Lange* was
taken in the automobile and conveyed to town.    They pulled
up in front of a saloon.    As a mere coincidence, *Passowicz*
was there.    *Lange* was taken inside and treated to whisky,
one or two drinks.    *Mrs. Lange* was found and the store
was examined.    They were told of its rental value and that
they could make more out of the rent of the store than they
could on the farm.    *Heckel* appeared on the scene and talked
trade with *Lange*.    *Lange* wanted $1,000 to boot.    *Heckel*
said he would have to come down to $500.    Whether he did
or not is a matter of dispute.    Anyway, *Heckel* wanted to

see the personal property on the farm. *Heckel,* Dominiczak, *Passowicz,* and the plaintiffs got into the automobile to go and see the personal property. At least four quart bottles of beer were taken along. The *Langes* say there were more. Just what the order of eventuations was after reaching the farm is somewhat in dispute. But this is certain: Wolski, a notary public and conveyancer at Pulaski, was brought to the farm; the beer was all drunk; the contracts were signed; the boot money was stipulated therein at $500; a note for $500 was given by the *Langes* to *Passowicz* and Dominiczak, to be paid in the event of their backing out. That night *Mrs. Lange* was so sick as the result of the liquor consumed that a doctor had to be called. The *Langes* claim that they were so intoxicated that they did not know what they were doing; that they never agreed to trade for $500 to boot, and that they did not agree to pay $500 to *Passowicz* in case they backed out, and, in fact, did not know that they had signed such a note. The *Langes* could neither read nor write and their signatures to the instruments were evidenced by their marks.

The next morning *Lange* discovered the nature of the contract and, without losing any time, proceeded to Green Bay to see a lawyer. The vigilant Dominiczak discovered *Lange's* movements and outdistanced him in a race to the lawyer. When *Lange* reached the lawyer, no advice, solace, or comfort was offered him. He was not told that Dominiczak had been to see him, or advised to consult another lawyer. He returned home. He found Mrs. Passowicz already there, extending comfort and consolation to his distracted wife, and soon thereafter the ubiquitous Dominiczak, with *Heckel,* appeared upon the scene. The purpose of the visit of *Heckel,* Dominiczak, and Mrs. Passowicz, as well as the spirit in which negotiations were resumed, is clearly revealed by the testimony of Dominiczak. He said:

"*Mrs. Lange* was in bed. She was not crying. I don't think she was sick. It was just a make-believe. She was

Lange v. Heckel, 171 Wis. 59.

crying. I saw people cry that cry different from that. I think it was just a make-believe. About the $500, *Heckel* says: 'As long as you don't figure on making the trade, want to back out, you might just as well settle with me and pay me $500, because if you don't I will sue you for it.'"

Just what was said back and forth is not very clear, but the above testimony of one of the defendants may be relied upon to disclose their attitude. There is ample evidence for the conclusion that this unsophisticated old couple were cajoled and threatened with lawsuits and the loss of their farm, until, eventually, they gave their note for $300, secured by a mortgage on the farm, payable to *Heckel,* which *Heckel* sold and gave Dominiczak $150, $70 of which was paid to *Passowicz.*

We may concede, for the purposes of the argument, that these facts and circumstances do not warrant a finding that an express agreement was entered into between the defendants to defraud the *Langes.* But such an express agreement is not necessary:

"A mere tacit understanding between conspirators to work to a common purpose is all that is essential to a guilty, actionable combination. Individual intent by two or more persons to do an unlawful act or a lawful act by unlawful means is the first step in that regard. Next follows concurrence by such individuals, not concurrence of action, merely, . . . but concurrence in mental intent to effect the common purpose, each to aid the others in that regard. Mutuality in the undertaking may be secured without any express agreement and without a spoken or written word between the conspirators or a meeting of the members of the combine, or their, even, all knowing each other; or the precise thing to be accomplished or plans for its accomplishment, either in a general way or in detail, being distinctly stated by any member of the combine to any other member. If there is a meeting of minds, brought about in any way, to accomplish the common purpose, the essentials of a guilty combination are all satisfied." *Patnode v. Westenhaver,* 114 Wis. 460, at p. 474 (90 N. W. 467).

The somewhat unusual ultimatum of *Heckel* to Domin-
iczak to sell the property that day or he would place it in
the hands of another agent, the calling of *Passowicz* to
town, the selection of *Lange* as a likely customer, without
prior negotiations or any prior indication that *Lange* enter-
tained any thought of trading his farm for village property,
the use of intoxicants, the misrepresentation as to the rent
of the property, *Lange's* proceeding to consult a lawyer as
soon as he discovered the nature of the contract, Dominic-
zak's watchful vigilance upon *Lange's* movements, the in-
tuitive sensing of the nature of his errand to Green Bay,
haste to frustrate his plans of securing legal advice, the
timely call of Mrs. Passowicz at the Lange home, the imme-
diate demand of settlement upon *Lange's* return, although,
by the terms of the contract, they had thirty days in which
to close the deal, the most unusual circumstance of the $500
note payable to Dominiczak and *Passowicz* in case of back-
ing out, the fact that no effort was made to enforce the con-
tract, together with a consideration of the ultimate result,
by which the *Langes* were fleeced of $300 without a vestige
of consideration moving to them, a division of the booty be-
tween the three defendants,—is all strongly persuasive of
the conclusion that there was a tacit understanding between
the defendants and a concurrence of mental intent on their
part to effect the common purpose of defrauding the *Langes*
by the procurement of the land contract in question.   To
our minds the verdict of the jury is abundantly justified by
the evidence.

Lest it be thought that our treatment of the evidence is
not entirely judicial and that we have indulged in fanciful
inference and innuendo, it should be remembered that the
evidence must be given every legitimate construction most
favorable to plaintiffs' contentions, and we feel that the
deductions we have made from the evidence are such as
practical men of affairs might reasonably draw therefrom.

Before the trial *Lange* was examined adversely under the

Lange v. Heckel, 171 Wis. 59.

provisions of sec. 4096, Stats.   Upon the trial *Lange's* counsel offered his deposition, given pursuant to such examination, in evidence, and the same was received, over objection by the defendants.   Later plaintiffs' counsel asked permission of the court to withdraw the deposition so read in evidence, which motion was granted, and *Lange* was placed upon the stand and testified.   It is contended by the defendants that it was error to permit the reading of the deposition in evidence, which error was not cured by the fact that *Lange* was subsequently placed upon the stand.   It is plain that the admission of the deposition in evidence was error.   An adverse examination under sec. 4096 is not the taking of a deposition to be used as evidence upon the trial of the case.   The object of such an examination is the obtaining of evidence for the party seeking the examination and against the party to be examined.   It may be used in evidence by the party taking it against the party examined as original evidence of admissions made against the interest of the party examined.   *Meier v. Paulus,* 70 Wis. 165, 35 N. W. 301.   In this case it appeared that there was no reason why *Lange* could not be offered as a witness at the trial.   As a matter of fact he was offered as a witness after his counsel had become fearful that his adverse examination was not admissible.   We hold that, at least under such circumstances, the adverse examination of a party under the provisions of sec. 4096 is not admissible as evidence in his behalf upon the trial.   Whether, if he were deceased, or for other reasons, his presence at the trial could not be secured, such an examination might be read in evidence, is not here involved and is not here decided.

The question now arises whether the withdrawal of the adverse examination or deposition, and the subsequent testimony of *Mr. Lange* upon the trial, cured the error of its admission.   The rule obtains in this court that a reversal will not result from error occurring in the admission of evidence, or otherwise, unless it appears that a result more

favorable to the appellant might probably have prevailed had the error not occurred. *Bell v. Milwaukee E. R. & L. Co.* 169 Wis. 408, 172 N. W. 791; *Braun v. M., St. P. & S. S. M. R. Co.* 170 Wis. 10, 172 N. W. 743. In order to justify a reversal of the case because of this error there must be some reason to suppose that had the adverse examination not been read in evidence a different verdict would have been returned. No effort is made on the part of appellants to point out any discrepancies between the evidence given by *Mr. Lange* upon the trial and that given in the adverse examination, to indicate that the jury might have been unduly influenced by the reading of the adverse examination in evidence. Unless by reading the adverse examination to the jury evidence of a persuasive character was placed before them which was not brought to their attention in any other way, or which *Mr. Lange* failed to testify to upon the trial, it is not apparent how the verdict of the jury could have been prejudicially influenced. No claim is made that the testimony of *Mr. Lange* upon the adverse examination was materially different from his testimony upon the trial. The appellants had full opportunity for cross-examination if such discrepancy did occur, and it is quite plain that some such incident should be pointed out if the case is to be reversed for that error, under the rule obtaining in this court above stated.

The defendants requested the court to include in the special verdict questions tending to elicit the character of the fraud perpetrated by them upon plaintiffs in the procurement of the land contract, such questions requiring the jury to find whether the defendants caused plaintiffs to become so intoxicated that they were incapable of making the contract in question; whether the contract and notes were procured by reason of such intoxication; whether they fraudulently made the contract and notes so as not to contain the oral agreement of the parties, by providing for the payment of $500 in case of withdrawal, and by making the

amount of the boot money $500 instead of $1,000. It is the contention of the defendants that they have a right to know whether the jury united in convicting them upon any one of these alleged charges, and they point out that some of the jury might have been of the view that the fraud consisted in inducing the intoxication of the plaintiffs, while others might have thought that it resulted from their infidelity in reducing the oral agreement to writing. There would be much force in this contention if it were not for the fact that the conspiracy of which they were convicted by the verdict of the jury is a conspiracy to defraud. It is a conspiracy to do an unlawful act, namely, to defraud the plaintiffs. The result of their operations having accomplished this purpose, the question of the steps taken and the methods pursued in the course of the conspiracy, which was an unlawful one, is immaterial, and we think the trial court properly declined to include the questions requested in the special verdict.

Exception is also taken to certain instructions given by the court in connection with the fifth question of the special verdict; to wit: Was the giving of the $300 note and mortgage in question agreed upon by the plaintiffs as a settlement in full of the cause of action? We do not think this question had any place in the special verdict. The first four questions made a complete case against the defendants. The cause of action resulting from the facts and circumstances found by such first four questions manifestly could not be settled by the giving of the $300 note and mortgage. The giving of that note and mortgage was the ultimate fruits of the conspiracy and they were the immediate instruments which brought damage to the plaintiffs and made their cause of action complete against the defendants. Of course it was the defendants' theory that the giving of the $300 note and mortgage was a settlement by the plaintiffs for their breach of the land contract. That idea, however, is completely negatived by the answer to the fourth question of the special verdict, where it is found that the defendants,

in carrying out their conspiracy and in furtherance of it, secured from the plaintiffs the $300 note and mortgage in question.    For this reason we find it unnecessary to consider whether the court properly instructed the jury in submitting the fifth question of the special verdict.

Judgment was rendered upon the special verdict in the sum of $469.    It is claimed by the appellants that there was no warrant for rendering judgment in this amount.    It will be noticed that the special verdict does not determine the damages sustained by the plaintiffs, and we confess that we were somewhat concerned as to the manner in which the amount of the damages was arrived at until we found, by reference to page 136 of the record, that this amount was practically agreed upon in open court by the attorneys for all parties.    In view of this circumstance, appellants are in no position to question the amount of the damages.

We find nothing further requiring comment.

*By the Court.*—Judgment affirmed.

ESCHWEILER, J. (*dissenting*).    The refusal of the trial court to submit as part of the special verdict the questions requested by defendants upon the issues raised by the answer and the evidence on material allegations in the complaint, was, in my judgment, a prejudicial, substantial denial of a right defendants are accorded by sec. 2858, Stats. *John E. DeWolf Co. v. Harvey,* 161 Wis. 535, 547, 154 N. W. 988; *Sadowski v. Thomas F. Co.* 157 Wis. 443, 451, 452, 146 N. W. 770; *Rowley v. C., M. & St. P. R. Co.* 135 Wis. 208, 216, 115 N. W. 865.

I think, also, that the form of the fifth question and the charge of the court upon it were each prejudicial error and that a new trial should have been granted.

A motion for a rehearing was denied, without costs, on March 9, 1920.