DREXLER and wife, Respondents, vs. ZOHLEN, Appellant.

*November 7—December 4, 1934.*

484

For the appellant there was a brief by *Puhr & Van de Water* of Sheboygan, attorneys, and *W. B. Rubin* and *Rubin & Zabel* of Milwaukee of counsel, and oral argument by *Mr. Rubin*.

For the respondents there was a brief by *Bowler, Bowler, & Currie* of Sheboygan, and oral argument by *Geo. R. Currie*.

FOWLER, J.   The appellant makes two principal contentions:   (1) That the court improperly changed the answer of the jury by which they found that the plaintiffs were not justified in relying upon the false representation which they found he made, and that the verdict as returned by the jury will not support a judgment against him based upon his own false representation; (2) that the finding of the jury that Zohlen entered into a conspiracy with Kaiser is not supported by the evidence.

(1) We are of opinion that the court was not justified in changing the answer of the jury that the plaintiffs were not justified in relying upon the one false statement found by them to have been made by Zohlen.   The false representation was that he (Zohlen) had dealt with the Paramount Company before and made money.   The question covering justification in reliance upon the representation was: "Were plaintiffs justified in relying on that representation?"   This amounts to a finding that reliance upon the truth of the representation did not justify the plaintiffs in entering into the contract and making their payments thereon.   No doubt the plaintiffs might rightly believe the representation to be true.   But reliance on the representation implies more than mere belief in its truth.   The matter believed must be of such a nature as of itself to constitute reasonable ground for

the action taken. We consider that the jury might rightly decide the question as they did. We are therefore of opinion that the judgment against Zohlen cannot stand unless it is supported by the findings of Kaiser's fraud and the existence of a conspiracy between Kaiser and Zohlen.

(2) If a conspiracy existed between Kaiser and Zohlen to wrong the plaintiffs, then Zohlen is responsible for the fraud of Kaiser perpetrated pursuant to the conspiracy to the same extent as Kaiser. 12 C. J. p. 610, § 178. It follows that if the evidence supports the finding of a conspiracy between Kaiser and Zohlen, the judgment must be sustained against Zohlen. All that is necessary to constitute a conspiracy between two or more persons to wrong another is that the alleged conspirators shall arrive at an understanding to commit the wrong. The understanding may be merely tacit. An express agreement is not necessary. *Patnode v. Westenhaver,* 114 Wis. 460, 474, 90 N. W. 467; *Lange v. Heckel,* 171 Wis. 59, 67, 175 N. W. 788; *Wachowski v. Lutz,* 184 Wis. 584, 593, 201 N. W. 234. The proof of a conspiracy necessarily rests upon circumstantial evidence. "The ultimate fact of the corrupt agreement, if proved at all, must be inferred from established facts and circumstances." *Lange v. Heckel, supra,* p. 64. With these rules in mind we must consider whether the evidence, giving it the most favorable interpretation in support of the verdict which it may reasonably bear, is sufficient to support the finding of conspiracy.

The jury might well infer from the evidence that the Kaisers thought that Zohlen, by reason of his standing in the community, would be of great service to them in furthering sales of lots to people residing in and near Sheboygan, and that to aid in furthering such sales they procured his consent to act as district manager for the Paramount Company. Zohlen admitted that he gave such consent. A half page advertisement was on June 11th published in the local

daily newspaper, purporting to be signed by Zohlen as district manager, which stated that Zohlen was district manager of the Paramount Company and contained the following statement:

"Here is the endorsement August Zohlen, a prominent Sheboygan citizen, gives our company and our proposition:

" 'I have thoroughly investigated the Paramount Development Co., Inc., and find them to be unquestionably reliable and reputable. Any business dealings with them will be satisfactory in every way. Their proposition for the sale of property at Fond du Lac and Wauwatosa Avenues in Milwaukee is an exceptional opportunity to make a good investment.' "

This "endorsement" was read by the advertising manager of the newspaper to Zohlen before it was published, and its insertion in the advertisement was expressly authorized by Zohlen. This advertisement was followed on June 15th and 20th by eight-inch, two-column advertisements in display type, and on June 22d by a five-inch, two-column advertisement in display type, all purporting to be signed by Zohlen as district manager. The newspaper in which the advertisement was published was delivered to Zohlen's residence daily. Although Zohlen denied knowledge of the advertisements, the jury were justified in believing not only that he expressly authorized and approved the first advertisement, but that he knew of the insertion of the other three. The sign on the door of the office occupied by the Paramount Company in Sheboygan contained the name of Zohlen as district manager. Zohlen admitted that he authorized this sign in the first instance, but claimed that he resigned as district manager in February, a week or so after he agreed to act as district manager, and that he then directed removal of the sign, but never went to the office to see if it was removed. However, the sign was still on the door as late as September. The jury may well have believed

that Zohlen knew of its continuance. Many prospective buyers were referred to Zohlen by the Kaisers, to all of whom he expressed approval of the purchase of lots in the plat as a good investment, and to some of whom he falsely stated that he had dealt with the Paramount Company and made money. He admitted in his testimony that he had expected to be paid for his services, and there was testimony by an unimpeachable witness that Zohlen had stated to him that he was employed by the Paramount Company on a straight salary. There was testimony that he was told on June 15th that the people of the Paramount Company were of such character that he ought not to be connected with the company, and was advised to withdraw as district manager; and was told on that day that the license of the Kaisers as real-estate brokers was revoked, and of the transactions on which the revocations were based. That prior to the sale to plaintiffs he was active in trying to procure a rescission of a fraudulent sale to a Mrs. Long, who had previously inquired of him as to the advisability of purchase as an investment of lots in said plat, and persuaded her not to see the mayor of Sheboygan or her attorney with view to preventing the perpetration of frauds on other residents of Sheboygan by the sale of lots in said plat. The first meeting of the plaintiffs with Jack Kaiser, the main factor in the perpetration of the fraud upon the plaintiffs, was late in June. Zohlen arranged this meeting by telephone call, and went with Kaiser and introduced him to Drexler. The professed purpose of the call was to ask Drexler as to the value of some property near Sheboygan Falls, the purchase of which Kaiser claimed to be considering and about which Drexler knew nothing. Drexler had been previously importuned to purchase by another agent of the Paramount Company, who had referred him to Zohlen, whom Drexler knew. Kaiser at this meeting importuned Drexler to purchase lots

in the Fond du Lac Avenue plat. On Drexler's saying that he had no money to buy, Kaiser asked if he did not have some securities to trade for the lots and learned of the mortgage and stock Drexler eventually traded in. After Drexler had on a Sunday agreed to purchase the four lots involved and paid down $100, and signed and delivered a judgment note for $3,800 in part payment, he complained to Zohlen and told him he wanted to withdraw from the transaction. Drexler had previously complained to Kaiser, who had falsely told him that the note had been negotiated at a bank, and had represented that the bank could collect the note, and if Drexler did not go through with the deal he would get nothing at all for the note. Zohlen then took an active part in getting Drexler to go through with the deal. He arranged the meeting between Drexler and Kaiser at his own house at which Drexler received back the note and turned over the securities, and himself told Drexler to bring the securities with him to the meeting. Zohlen told Drexler, when Drexler complained to him, that if Kaiser had discounted the note at a bank the bank could collect it. This meeting was on August 14th, and the land contract was then signed and the securities delivered by Drexler in part payment. Zohlen's testimony at the trial was in many respects contradictory to that of witnesses of apparently unimpeachable character. His testimony on adverse examination before trial was in some respects contradictory to his testimony on the trial. His attempted explanations of some matters were so unreasonable as to be unbelievable. He professed at the trial, after Kaiser's fraud had been fully established, to believe that Jack Kaiser was honest and that the business of the Paramount Company had been fairly and honestly conducted. He professed on the trial that everything he had done in connection with Paramount Company sales, and he had been interviewed respecting pur-

chase by many purchasers, was done solely for the purpose of benefiting the purchasers. In view of all this, we consider that the jury's finding of a conspiracy cannot be disturbed.

The appellant assigns as error and ground for a new trial: (3) That plaintiffs' counsel by questions to witnesses showed that certain agents of the Paramount Company were Jews; (4) that he was not permitted to prove upon the trial the "good character" of Zohlen; (5) that parts of the adverse examination of Jack Kaiser were improperly excluded; and (6) that portions of the adverse examination of Drexler were improperly excluded.

(3) Counsel for plaintiffs put to three several witnesses the question relating to three several agents of the Paramount Company: "What nationality is he?" and elicited the answer in two instances, "Jew;" and in the other, "I don't know; I think Jewish." The first and second time the question was put there was neither objection to the question nor suggestion of impropriety by defendant's counsel. In the third instance there was no objection to the question. But after the witness had answered, "Jew," defendant's counsel stated: "Now, Your Honor, I think it is unfair to inject the question of nationality in this case." Whereupon the court stated: "Yes; I don't think, Mr. Currie, that the question should be asked." Thereafter the matter of nationality was not mentioned in relation to anyone, either during the examination of witnesses, or during the argument. We see in this no ground for a new trial, if for no other reason, because the only possible prejudicial effect of an answer or insinuation that the salesmen were Jews, if the fact could be prejudicial at all, would be to prejudice the Paramount Company on the issue of the company's fraud. But the company's fraud is plainly proved by the misconduct of Jack Kaiser alone. The putting of the question had no bearing upon

Kaiser's conduct. As that conduct forms the main basis of the verdict, the putting of the question did not affect the verdict and was not prejudicial. Moreover, as soon as objection was made to the ascertainment of the nationality of any agent, the court ruled that it was improper and that ended the matter. Had the objection been made to the question when it was first propounded, it would have been sustained and the fact of nationality would not have been disclosed. Defendant's counsel are responsible not only for the repetitions but for disclosure of the facts respecting nationality, for not objecting to the question when first propounded before the question was answered. Appeals on argument to race prejudice are objectionable, and when it appears that a verdict was influenced by them constitute reversible error, but when such influence is not probable a verdict should not be disturbed because of them. 64 C. J. p. 277, § 295. This court does not reverse judgments for misconduct of counsel in argument unless it is likely that it influenced the verdict upon which the judgment is based. *Juneau Store Co. v. Badger Mut. Fire Ins. Co., ante,* p. 342, 257 N. W. 144. Here we do not have misconduct in argument or any disparaging or inflammatory remarks, and if the question complained of was improper the judgment is not affected by it.

(4) Appellant's counsel concedes that the great weight of authority is against the proposition that evidence of good character of the accused party is admissible in civil actions grounded on alleged fraud. The concession is justified. The precise point is fully treated in a note in 78 A. L. R. 643. Decisions of the United States courts and of the courts of twenty-two states are there cited as supporting the exclusion of such evidence. The courts of New York seem to have been on both sides of the question. *Ruan v. Perry,* 3 Caines (N. Y.), 120, upheld the admission, but *Gough v.*

*St. John,* 16 Wend. (N. Y.) 646, expressly overruled the *Ruan Case.* In the opinion in *Bowerman v. Bowerman,* 76 Hun, 46, 27 N. Y. Supp. 579, an action to set aside a deed executed by the plaintiff twenty years prior to the trial, and involving transactions twenty-five to forty years prior thereto, in which the defendants claimed under a deceased grantee whom the plaintiff charged with fraud inducing the execution of the deed, it is said, without mention in the opinion of either the *Ruan* or the *Gough Case,* that evidence of the deceased's good character should have been received. The judgment was affirmed without opinion in 145 N. Y. 598, 40 N. E. 163, with the statement:

"Agree to affirm order and for judgment absolute in favor of defendants upon stipulation on opinion below. All concur. Order affirmed and judgment accordingly."

The appeal was from an order which reversed a judgment in favor of the plaintiff entered upon a report of a referee and ordered a new trial before another referee. After saying in effect that the matters litigated were concluded by a settlement made twenty-two years prior to the trial, the opinion of the appellate division goes on to say that "under the circumstances of this case, we think the testimony [of good character of the grantee] admissible, and its exclusion error." In absence of knowledge of the nature of the "stipulation" upon which, in part, the judgment of the court of appeals was entered, it is impossible to determine that it upheld the view of the appellate division as to the admissibility of evidence of good character. It is stated in *McKane v. Howard,* 202 N. Y. 181, 185, 95 N. E. 642, 643, that "the law has been from the earliest period that such testimony [good character in fraud cases] was inadmissible" for the purpose of showing whether or not the acts charged were done, citing the *Gough Case, supra.* It would seem that the New York rule is for exclusion of the evidence rejected.

Decisions of the courts of five states are given in the note cited as for receipt of such evidence. Perhaps a sufficient justification of the majority rule is given in 2 Jones, Evidence (2d ed.), p. 1188, § 638:

"In popular estimation few facts are more potent in determining the merits of any claim than the character of the respective litigants; and yet it is the general rule of law that in civil actions the character of the parties is irrelevant. However just the inferences which might in many cases be drawn as to the merits of the controversy from the character of the parties, such inferences are too vague and unreliable for that degree of certainty which should prevail in legal tribunals."

"If in all cases of contract and tort such evidence were to be received, the result would be more dependent on the popularity of the party than on the merits. The testimony would consist largely of matters of opinion and be greatly affected by bias and partisanship and would cause intolerable delay and expense."

In *Robinson v. Van Hooser* (C. C. A.), 196 Fed. 620, a civil action grounded on conspiracy to defraud, objection to evidence of good character was held correctly excluded and many cases are cited in support of the holding. *Adams v. Elseffer,* 132 Mich. 100, 92 N. W. 772; *Simpson v. Westenberger,* 28 Kan. 756, 42 Am. Rep. 195; *Wright v. McKee,* 37 Vt. 161, may be cited as strongly supporting exclusion. This court seems not heretofore to have passed upon the question of receipt of evidence of good character in fraud cases, but we unhesitatingly hold that such evidence is inadmissible except possibly in cases where the transactions involved are extremely remote in point of time or the party charged with the fraud is dead, as in the *Bowerman Case, supra,* and in *Rasmusson v. North Coast Fire Ins. Co.* 83 Wash. 569, 145 Pac. 610, as to which we express no opinion.

(5) The adverse examination of the defendant Jack Kaiser was taken by the plaintiffs before the trial. Appellant contends that as Kaiser, his codefendant, was not pres-

ent at the trial, he had the right to introduce Kaiser's adverse examination in evidence in support of his own defense. That a defendant may in the absence of the witness use the ordinary deposition of a witness not a party taken by the plaintiff before the trial is true. But the adverse examination of a party under sec. 326.12, Stats., is by the statute placed upon a different footing than an ordinary deposition. Sub. (5) of the section provides that the deposition may be used on the trial by the party taking it. This, under the rule *inclusio unius est exclusio alterius,* prevents its use by any other party, at least when the party whose examination was taken is present in court. *Estate of Shinoe,* 212 Wis. 481, 250 N. W. 505. That such use of the deposition may not be made where the presence of the party might have been procured is held in *Thomas v. Lockwood Oil Co.* 174 Wis. 486, 182 N. W. 841, and *Lange v. Heckel, supra.* If the adverse examination was admissible in behalf of Zohlen, it would seem that it was under sec. 325.31, Stats., not cited by counsel, which provides that—

". . . the testimony of a deceased witness, or a witness absent from the state, taken in any action or proceeding . . . shall be admissible in evidence in any *retrial,* or in any other action or proceeding where the party against whom it is offered shall have had an opportunity to cross-examine said witness, and where the issue upon which it is offered is substantially the same as the one upon which it was taken."

It may be doubted whether this section should be applied to an adverse examination of a party before trial. Taking the statute literally, as applied to a case in which the testimony was taken, it applies only to a *retrial* of that case, and thus inferentially would seem to refer only to testimony used upon a previous trial. However, it is stated in *Nelson v. Ziegler,* 196 Wis. 426, 220 N. W. 194, that the testimony of a deceased party given on adverse examination before trial is admissible under the statute last cited, and by the

same token such testimony of a party absent from the state would be admissible. But Kaiser was not dead at the time of the trial, nor is there any showing that he was absent from the state. Nor does it appear that his presence at the trial could not be procured so that the *Thomas* and *Lange Cases, supra,* support the rejection.

It is to be noted further that the whole deposition was not offered in evidence. The offer was "to read into the record *from* the deposition [adverse examination] of Jack Kaiser." The offer was made during the examination of Zohlen as a witness in connection with an offer of a report of the Merchants' & Manufacturers' Security Company. It was stock in this company that Zohlen claimed to have turned in as part payment for the lot he had purchased from the Paramount Company. The report would pertain merely to the value of that stock. The report was rejected. Counsel then stated that what he wished to read from Kaiser's adverse examination referred to that stock. Whatever bearing Kaiser's testimony relative to that stock would have would go merely to the truth of the representation that Zohlen had paid $10,000 for his lot. But as the jury found that this representation was true the rejection of the offered testimony was not prejudicial, if it was erroneous.

It is claimed that another portion of Kaiser's adverse examination relative to why a $13,000 life insurance policy was not issued to the plaintiff Drexler was erroneously rejected. But the record shows that the portion offered so relating was received.

(6) It is also claimed that portions of the adverse examination of Drexler taken by Kaiser before the trial were erroneously rejected. We have read the record relating to this matter and are unable to discover that any portion of the adverse examination of Drexler that was offered was rejected, except as it appears that an objection was made to a question in the adverse examination that referred to charg-

ing Gaines in the complaint with conspiring with the Kaisers and Zohlen. Objection was made to the question on the ground of immateriality because the complaint had been dismissed as to Gaines, and the court stated that the objection was sustained for the reason stated. We do not perceive that the ruling was erroneous. If there was anything in the answer to the question that was material the record does not disclose it. The adverse examination is not in the bill of exceptions, nor is the answer to the question to which objection is made. We cannot say that the rejected answer was material if it in fact was.

*By the Court.*—The judgment of the circuit court is affirmed.