EISENBERG, Appellant, v. CONTINENTAL CASUALTY COMPANY, Respondent.

*No. 208. Argued October 8, 1970.—Decided November 6, 1970.*
(Also reported in 180 N. W. 2d 726.)

638

For the appellant there were briefs by *Godfrey &
Kahn,* attorneys, and *William H. Alverson* and *James
Ward Rector, Jr.,* of counsel, all of Milwaukee, and oral
argument by *Mr. Alverson* and *Mr. Rector.*

For the respondent there was a brief by *Frisch, Dudek,
Slattery & Denny,* attorneys, and *Edward A. Dudek* and
*Robert D. Scott* of counsel, all of Milwaukee, and oral
argument by *Edward A. Dudek.*

CONNOR T. HANSEN, J.  On December 24, 1962, the
plaintiff applied for disability income insurance under
a group policy. The insurer offered three different
"plans" or schedules of benefits. The plaintiff applied
for Plan A benefits of $1,000 per month. The insurer
issued its certificate of insurance providing for Plan A
benefits effective February 1, 1963. In November, 1966,
the plaintiff suffered a cerebral thrombosis which re-
sulted in his disability within the meaning of the policy.
In December, 1967 (the policy contained a one-year ex-
clusionary period), he made his claim to the insurer for
the monthly indemnity provided under his certificate.
The plaintiff was informed by the defendant that his

certificate was void from the date of issue and defendant tendered back to the plaintiff the premiums he had paid in the amount of $1,375, which tender was refused.

On May 17, 1968, the plaintiff commenced this action against the insurer alleging that the insurance benefits were wrongfully denied him by the defendant. Defendant answered denying liability for the indemnity and counterclaimed for rescission of the certificate of insurance on the ground that it had been procured by the plaintiff's fraudulent misrepresentations. The plaintiff, in reply to the counterclaim, denied the certificate was fraudulently procured and set forth as a separate defense a prayer for equitable relief to reform the certificate so as to provide for monthly indemnity of $500.

A detailed recitation of the plaintiff's medical history for the several years prior to his applying for insurance is not essential to the resolution of the issues raised on this appeal.

The plaintiff responded in the affirmative to the following two questions in the application for insurance:

"5. Are you now to the best of your knowledge and belief in good health and free from any physical impairment or disease?"

and

"6. Have you ever had any medical advice or treatment for or had any of the following:

"Disorder of the nervous, hematopoietic, musculoskeletal, genitourinary, endocrine, respiratory, cardiovascular or gastrointestinal system; impairment of hearing or vision; loss of hand, foot or eye; alcoholism or drug addiction?

"If 'Yes' is checked on any part of No. 6, give details in the table below or in separate statement."

After answering question 6, "Yes," the plaintiff responded to directions in the application by stating that on July 15, 1962, he had a solitary cyst of one kidney removed and had recovered. Actually, it appears the

plaintiff had an extensive medical history, including several hospitalizations during the years preceding the application.

*Applicability of sec. 209.06, Stats.*

Plaintiff contends that the trial court erred in proceeding on the theory that sec. 209.06, Stats., was applicable to the case; and that the statute was not applicable, but rather the effect of any misrepresentations in the application for insurance is governed by common-law fraud.

The certificate of insurance provided that after three years from the effective date of the policy no statement in the application, except a "fraudulent misstatement" could be used as a defense to a claim under the policy.[1] The plaintiff claims that under the statute it is sufficient to defeat liability if the false representation is made with intent to deceive, while under the policy the defendant can only defeat liability by proving the elements of fraud, which include the additional requirement of reliance. Plaintiff concludes that since the standard for defeating liability set forth in the certificate is higher than the requirement set forth in the statute, the statute does not apply.

"A statute providing under what conditions a breach of warranty which exists at the time an insurance contract is made shall constitute a ground for avoiding the policy becomes a part of the contract. . . . But while the insured cannot waive the protection given him by the statute, the parties may enter into an agreement more favorable to the insured than the statute prescribes." 43 Am. Jur. 2d, *Insurance,* p. 741, sec. 757.

---

[1] ". . . nor shall any such statement of any Insured eligible for coverage under the policy, except a fraudulent misstatement, be used at all in defense to a claim for loss incurred or disability commencing after the insurance coverage with respect to which claim is made has been in effect for three years from the date it became effective."

However, the plaintiff's reliance on common-law fraud is misplaced. If the statute is inapplicable, the common law relating to misrepresentations rather than fraud would apply. Under the common law relating to misrepresentations, as it existed in Wisconsin prior to the enactment of sec. 209.06, Stats., the insurer did not have to prove reliance to defeat liability. Rather to defeat liability, it was necessary that the misrepresentation be material. Any statement in an application was regarded as material which did, or might have, influenced the insurer in accepting or rejecting the risk. *Keeler v. Niagara Fire Ins. Co.* (1863), 16 Wis. 550 (*523) ; *Ryan v. Springfield Fire & Marine Ins. Co.* (1879), 46 Wis. 671, 1 N. W. 426; *See also:* Note, *Insurance—Representations—Concealment—Warranties—Conditions—and Exceptions,* 7 Wisconsin Law Review (1932), 261.

Under the provisions of sec. 209.06, Stats., it is also necessary that a false statement made with intent to deceive be material before liability is defeated.[2]

[2] "A literal interpretation of the Wisconsin statute might dispense with the necessity of proving that a misrepresentation is material to the risk, it being sufficient to show that it is made fraudulently, or increases the risk, or contributes to the loss. Following such a literal construction, some courts in other states have held that a fraudulent, immaterial misrepresentation is fatal to the insured's rights. See Vance, Insurance 395–8. Such a construction is less liberal to the insured than was the common-law rule, and seems clearly contrary to the legislative intent.. *Johnson v. Nat. Life Ins. Co.*, 123 Minn. 453, 457, 144 N. W. 218 (1913). Although the rule in Wisconsin has not been distinctly enunciated, the court seems to hold that the materiality of the misrepresentation must be proved, in addition to a fraudulent intent. *Conklin v. New York Life Ins. Co., supra; Monahan v. Mutual Life Ins. Co., supra.* At least no case has been decided in which the court says that materiality of the false representation is not essential. If this is the doctrine of the Wisconsin court, it is clearly correct on principle, and is in line with the weight of authority in other jurisdictions where similar statutes are in existence. Vance, Insurance 394–8; Cooley, Briefs on Insurance 1937. However lacking in precision and clarity the language of the Wisconsin statute may be, it is evident that there was no intent to increase the rigor of the

Thus, whether the statute or the common law relating to misrepresentation is applied, it is not necessary to prove reliance as the term is used in common-law fraud; rather in both instances, it is necessary that the false statement be material. Therefore, the phrase, "fraudulent misstatement," as used in the certificate and construed under the common law relating to misrepresentation, does not differ from that part of the statutory standard relied on by the insurer, and the trial court did not err in finding the statute applicable.

*Jury instructions.*

The plaintiff claims to have been prejudiced by erroneous instructions given by the trial court. After the defense had rested its case, the trial court submitted special verdict questions to counsel for comment. The special verdict included two questions:

"*Question No. 1:* Did the plaintiff, Louis A. Eisenberg, M.D., falsely represent to the defendant, Continental Casualty Company, that he had no cardiovascular disorder?"

common-law rule to the prejudice of the insured." Note, 7 Wisconsin Law Review, *supra*, 266, 267.

"What has Section 209.06 done to the representation? Probably little or nothing, as it has been construed by the Wisconsin court. Since the three separate grounds for avoidance are connected in the statutes by the disjunctive 'or' it would appear that an entirely reasonable construction would be that the existence of but one is required. Concretely applied, a false representation made with intent to deceive, might logically be held a defense, whether or not it be material, increases the risk, or contributes to the loss. No Wisconsin decision so holds, but the question has never been passed upon by the court. In view of the mischief that Section 209.06 was obviously designed to remedy, it is reasonably safe to predict that such a construction would not be sanctioned, since it would distinctly liberalize, rather than restrict, the common law rule which imposed upon all misrepresentations the positive requirement of materiality." Crowell, *False Statements By Applicants For Policies Of Life Insurance,* 19 Marquette Law Review (1935), 228, 236.

*"Question No. 2:* If you answer Question No. 1 'Yes', then answer this question:

"Was such false representation made with intent to deceive the defendant, Continental Casualty Company?"

Plaintiff's counsel made no objection to the proposed questions but requested an additional question relating to reliance. The trial court rejected this request. In his closing argument, plaintiff's counsel argued to the jury that the first question should be answered "Yes," and in his brief he acknowledges that plaintiff made a representation which was false.

No jury instructions were submitted or requested, and following the closing arguments the trial court instructed the jury drawing from Wisconsin Jury Instructions— Civil, Part II, sec. 3100. Part of the instructions as to the first question of the special verdict were as follows:

"Falsely represent means knowingly and wilfully, in bad faith to state as a fact or a truth that which is known, or ought to be known, to be false."

After the instructions had been given, plaintiff's counsel objected to that part of the instructions on the ground that, in view of his statement in the closing argument, it would mislead the jury into thinking that fraudulent intent had been conceded.

Thereafter counsel stipulated that the first question be answered, "Yes" by the court, and the court instructed the jury that the first question had been answered "Yes" by the court. The trial court also instructed the jury that the fact that the first question had been answered "Yes" by the court should not influence them in any manner as to their decision, and the second question should be answered independently of how the first question was answered.

We find the plaintiff was not prejudiced by the instruction relating to that question, particularly in view of his subsequent stipulation to an affirmative answer to that question. The trial court's instructions, follow-

ing the stipulation, adequately informed the jury they were to decide the issue of intent to deceive independently of the first question.

*Testimony of character witnesses.*

The plaintiff's testimony was taken in the presence of the trial judge in the plaintiff's home, several weeks prior to the trial, because the state of his health made it unlikely he would be able to testify in person at the trial. At the trial, plaintiff's testimony was given by counsel reading the transcript of his deposition to the jury.

Plaintiff offered the testimony of three character witnesses. The trial court refused to admit such testimony. We find no error in refusing to admit evidence of good character in a civil case such as this.

"In view of the presumption in favor of the good character of an individual, . . . as a general rule a party is not entitled to introduce evidence of his good character, in the first instance, merely because his adversary has, by the pleadings or the nature of the action, charged him with committing a legal wrong, or even an act for which he might be subjected to a criminal prosecution, as, for example, . . . fraud, . . . 32 C. J. S., *Evidence,* pp. 37, 38, sec. 426.

". . . Perhaps a sufficient justification of the majority rule is given in 2 Jones, Evidence (2d ed.), p. 1188, sec. 638:

" 'In popular estimation few facts are more potent in determining the merits of any claim than the character of the respective litigants; and yet it is the general rule of law that in civil actions the character of the parties is irrelevant. However just the inferences which might in many cases be drawn as to the merits of the controversy from the character of the parties, such inferences are too vague and unreliable for that degree of certainty which should prevail in legal tribunals.'

" 'If in all cases of contract and tort such evidence were to be received, the result would be more dependent on the popularity of the party than on the merits. The testimony would consist largely of matters of opinion

and be greatly affected by bias and partisanship and would cause intolerable delay and expense.'

". . . This court seems not heretofore to have passed upon the question of receipt of evidence of good character in fraud cases, but we unhesitatingly hold that such evidence is inadmissible except possibly in cases where the transactions involved are extremely remote in point of time or the party charged with the fraud is dead, as in the *Bowerman Case, supra,* and in *Rasmusson v. North Coast Fire Ins. Co.* 83 Wash. 569, 145 Pac. 610, as to which we express no opinion." *Drexler v. Zohlen* (1934), 216 Wis. 483, 494, 257 N. W. 675.

We do not consider *Drexler* authority for admitting evidence of good character in this case. The two exceptions referred to in *Drexler* do not encompass the situation here presented. Furthermore, as to the two exceptions mentioned in this case, it is expressly stated that this court expresses no opinion as to the admissibility of evidence of good character under the exceptions mentioned therein. Also, in the instant case, although the plaintiff was unable to testify in person, his deposition was offered and received in evidence, read in court during the trial, and considered by the jury.

### Description of demeanor.

Plaintiff requested that the trial judge describe to the jury, or permit the plaintiff's attorney to describe to the jury, the physical condition and demeanor of the plaintiff at the time his deposition was taken. The trial judge on two occasions explained to the jury that the plaintiff's physical condition was such that he was physically unable to be present in court but he did not describe nor permit counsel to describe his demeanor.

The trial court did not err in refusing to attempt to give a more detailed description of the plaintiff's physical condition. If the trial court had undertaken to describe the witness' demeanor it would have invaded the

province of the jury in assessing the credibility of the witness.

". . . The trial judge should be careful not to express or intimate his opinion as to the credibility of a witness; the jury are the sole judges of the credibility of witnesses, and any comment by the judge of this kind is invasive of their province. Therefore, the trial court may not make comments, insinuations, or suggestions indicative of belief or unbelief in the integrity or credibility of witnesses. . . ." 53 Am. Jur., *Trial,* p. 80, sec. 82.

In *Lorenz v. Wolff* (1970), 45 Wis. 2d 407, 173 N. W. 2d 129, this court discussed the impropriety of an attorney testifying on behalf of his client except as to purely formal matters. The court stated at pages 419, 420:

"Pertinent to what happened at the trial are the provisions of the *Code of Professional Responsibility,* as proposed by the American Bar Association, which, with modifications, have been adopted by this court, to be effective on January 1, 1970. Therein, under *Disciplinary Rules* referring to *Trial Conduct* appears the provisions of DR 7–106 (C):
" 'In appearing in his professional capacity before a tribunal, a lawyer shall not:
" '. . .
" '(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.
" '(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.' 43 Wis. 2d lxiii.
"The new rule, . . . is, . . . an amplification of Canon of Professional Ethics No. 19 of the American Bar Association, which at the time of trial was in effect for all Wisconsin lawyers. That canon provides:
" 'When a lawyer is witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client.' "

*Prejudicial remarks of the trial court.*

It is also contended that the trial court prejudiced the jury by suggesting that the doctor had to know the true nature of his condition. The comments of the court objected to are as follows:

" '*Q.* Does it also mean that it can be persistent but fluctuate from high to low?

" '[*Defendant's attorney*] : Your Honor, I am going to have to object to this question because I think that if we are speaking in terms of a specific disease that a further definition is required. If we are speaking in terms of simply a label to describe a particular physical phenomenon that that should be made clear. Because I think that the question gets into different things.

" '*The Court:* Will the reporter read the question to me.

" ' (Pending question read.)

" '*The Court:* Well, the doctor is testifying as a physician based upon his own knowledge. He may answer.

" '[*Defendant's attorney*] : I recognize that.

" '*The Court:* He may answer.

" '[*Defendant's attorney*] : I recognize that, your Honor.

" '*The Court:* The Court has ruled. He may answer.

" '[*Defendant's attorney*] : I think I would like a clarification, however. I think the question should be asked in terms of either we are describing a condition or we are talking about a disease. I think the answer could be different from any given expert witness depending on which sense we are using the word hypertension.

" '*The Court:* Then any answer the doctor gives to any question you have a right to have him clarify. In fact, I would like to know myself if he knows what was the cause of the fluctuating blood pressure if he went to a doctor for treatment for it. Now, generally, I mean, a patient asks a doctor what causes this. So, he must have been informed as to what the cause was that he was being treated for, and then if he was, as to what his own knowledge is as to what was the cause of it.'

"*Q.* Do you agree with the statement that it was customary at one time not to inform?

"*A.* You are speaking of one time.

"*Q.* I see.

"*A.* I can only speak about my information and knowledge.

"*Q.* I see.

"*A.* And it is not a common practice among most of the people with whom I am associated. But I do know, and you are right, that it has been done. And the point I think is properly taken.

"*The Court:* Would you believe that there would be a likelihood though that if a doctor's blood pressure was taken the doctor would be informed?

"*A.* It would be extremely likely that he would be told."

Taken in their context in the record, we do not consider that the inquiries of the trial court constituted prejudicial error.

### *Equitable relief.*

Appellant claims to be entitled to Plan C indemnity as a matter of law. Defendant offered three plans of indemnity under the group policy. Plan C provided monthly benefits of $500. Defendant reserved the right to limit impaired risks to the benefits obtainable under Plan C. However, issuance of Plan C certificates was guaranteed to applicants during the insurer's *Charter Enrollment* period regardless of the applicant's past medical history. Except for the amount of indemnity, the provisions of the three plans were identical. The plaintiff applied for and was issued a certificate providing for monthly benefits of $1,000 under Plan A. Defendant's chief underwriter testified that applicants for Plan A who did not meet the underwriting requirements for that plan were rejected for that coverage, but would have been offered Plan C coverage.

Appellant contends that because applicants were guaranteed Plan C coverage regardless of their past medical history, he is entitled to the indemnity provided in that plan as a matter of law. In *Vander Veer v. Continental*

*Casualty Company* (1968), 30 App. Div. 2d 506, 294 N. Y. Supp. 2d 353; affirmed (1969) 24 N. Y. 2d 986, 302 N. Y. Supp. 2d 817, this issue was considered. In that case the insured sued to recover on a policy apparently identical to the policy in this case. The insurer refused to make payments alleging that the plaintiff had materially misrepresented the condition of his health. The court held the plaintiff was entitled to partial summary judgment for the amount of benefits under Plan C, stating:

". . . While the policy provides different amounts of indemnity designated as 'Plans,' they were all offered as part of one contract with the American Medical Association to provide insurance to its members. A contract between the defendant and any eligible member came into being upon the filing of an application by the member and, in effect, the member would be insured at least under Plan 'C' regardless of past medical history. While the policy reserved the defendant's *right to limit* a member's indemnity to this latter plan if 'evidence of insurability satisfactory and acceptable to the Company' was not furnished, it did not reserve to the Company the *right to reject* an application of an eligible member during the initial enrollment and the defendant cannot, therefore, now argue that any alleged misrepresentation regarding a medical history would relieve it of its obligation. It is to be noted that only after the initial charter enrollment period could the defendant reject, even under Plan 'C,' a member found to be uninsurable for medical reasons. "
. . .
"Upon this phase of the litigation, there being an absence of any issues of fact to be determined, plaintiff is entitled to partial summary judgment in the amount of $500 per month from the date of his total disablement to the date action was commenced, without prejudice to a further recovery under Plan 'A' upon trial of the action." *Vander Veer v. Continental Casualty Company, supra,* pp. 508, 509.

While the New York case is persuasive authority, it does not follow that it is precedent in this state. In

*Jewell v. United Fire & Casualty Co.* (1964), 25 Wis. 2d 509, 515, 131 N. W. 2d 276, this court, while permitting reformation of an insurance policy because of mutual mistake of fact, stated:

"A court will not reform a document to abet a fraudulent scheme. *Moore v. Michaelson* (1913), 152 Wis. 352, 358, 140 N. W. 28."

The plaintiff, however, contends that the *Jewell* decision is not applicable in this case because plaintiff is not seeking reformation. Plaintiff claims the defendant is seeking rescission, an equitable remedy; and plaintiff's prayer for relief is to limit the effect of that rescission on the ground that the defendant has not shown an equity as to Plan C benefits. Plaintiff claims that the reformation, therefore, is granted, if at all, on the defendant's prayer for rescission. This theory, however, is premised on the plaintiff's suggestion that the insurance offered did not consist of three separate contracts. Plaintiff claims there was but a single contract, with three separate and divisible coverages.

However, both offer and acceptance are necessary for the creation of a contract. In this case the offer and acceptance covered Plan A benefits. An offer of Plan C coverage was guaranteed, but there was no acceptance of that coverage. Thus, rescission of the plaintiff's certificate for Plan A coverage would not have the effect of creating coverage under Plan C, and Plan C coverage would be created if at all on the plaintiff's affirmative prayer for reformation.

This court has held that a fraudulent misrepresentation as to part of a contract operates to cancel the entire contract.

". . . [T]he fraud in part taints the whole note. Story on Bills, sec. 187; *Swartzer v. Gillett,* 2 Pin. Wis., 238. Having, through their agent, obtained this note including a fraudulent sum for the benefit of others, they cannot be heard to support it, *pro tanto,* on a *bona fide* claim for their own benefit." *United Brethren Church of New London v. Vandusen* (1875), 37 Wis. 54, 60, 61.

The public policy militating against partial rescission of a contract is stated as follows:

"There are many cases where, although a contract cannot be literally performed in all its parts, the Court will modify it, . . . But this is only where there has been a perfect *bona fide;* there is no case where it has been done at the instance of a Plaintiff, who has practised any misrepresentation. . . .

"If it were otherwise, and if a contract under these circumstances were only to be altered *pro tanto,* and only the part thus obtained were to be taken out of it, what encouragement would be offered to fraud. The party, if not found out, would gain his object; and if detected, would have the benefit of the contract, in the same manner as if he had practised no deception. The Court has therefore settled, that he must come with perfect propriety of conduct. If he does not, that alone is a sufficient answer to him." *Clermont (Viscount) v. Tasburgh* (17 Chancery 1819), 37 Eng. Rep. 318, 321.

*By the Court.*—Judgment affirmed.