MARY P. SCHEELE v. UNION LOAN & FINANCE COMPANY AND OTHERS.[1]

August 27, 1937.

Nos. 31,296, 31,305.

[1]Reported in 274 N. W. 673.

*John T. Rohwedder,* for appellant Union Loan & Finance Company.

*Richard Converse,* for appellant Charles W. Sterling.

*Peter E. Kamuchey,* for respondent.

STONE, JUSTICE.

Action to recover damages for fraud. Plaintiff has a verdict against all three defendants for $11,900. Defendants Union Loan & Finance Company (to be referred to hereinafter as the Union company) and Charles W. Sterling moved separately for judgment notwithstanding or a new trial, and each appeals from the order denying the motion. No such motion was made by defendant Erickson, who is no party to these appeals.

Plaintiff pleads but one cause of action, based on the several transactions herein considered. Assuming fraud in each of them, they would constitute ordinarily separate causes of action against the wrongdoers. But plaintiff has welded them into a single claim un-

der hammer of the charge that defendants were coconspirators in a successful scheme to defraud her.

■ Plaintiff is a widow to whom was left some $15,000 on the death of her husband in 1919. Most of that estate she promptly invested in Northern States Power Company six and seven per cent preferred stock, dividends on which have since been paid without interruption.

Defendant Union company is a corporation, launched locally in 1927 for the conduct of a general loan and finance business. Defendant Sterling soon became and remains its president and a member of its board of directors. It conducted a general stock-selling campaign which, according to the testimony of its secretary, Mr. Barnes, was "exclusively in the hands" of defendant Sterling as its president. Its stock was sold through duly licensed salesmen, of whom defendant Erickson was not one. But he collaborated much and actively in the sale of stock and, to the knowledge and with the approval of defendant Sterling, assisted in the sale of stock to plaintiff.

Plaintiff's first purchase of Union stock was of 12 shares of preferred in 1928. There followed four other transactions. (1) In April, 1929, plaintiff purchased 159 shares of the preferred stock of the Union company and 62 shares of its common. She made payment by selling all her Northern States Power stock of the then value of $11,400. (2) In May, 1930, she purchased 71 shares of preferred and 71 shares of common stock of the North Central Corporation, for which she paid $4,700. (3) In April, 1932, she surrendered all her North Central Corporation stock in exchange for $2,500 par value of the bonds of St. Andrews Hospital of Minneapolis, and a $1,000 bond of Central Public Utility Corporation. (4) In November, 1932, she was prevailed upon by defendant Erickson to exchange all her Union stock, which had cost her more than $11,400, for the fee of certain lots in Superior, Wisconsin, and a mortgage upon others in the same locality.

The North Central Corporation was organized in 1929 to engage in a general finance business. It was promoted by the same interests back of the Union Loan Company. Defendant Sterling was its

first president and remained such until January, 1932. The board of directors of the two companies were interlocking to a marked degree. The sale of its stock was conducted from the same office as that of the Union company, which adjoined the law office of defendant Sterling. It is a reasonable inference from the evidence that the North Central Corporation, although not strictly speaking a subsidiary of the Union company, was an adjunct thereof under the same management and organized for the purpose of making loans which the elder and related company could not make.

Plaintiff, at the beginning of the case history, was well along in her sixties. She had little of education, less of business experience, and was very deaf. She met defendant Sterling soon after her first purchase of Union stock. She knew he was president of the company and a lawyer. There is abundant evidence upon which the jury could have found that as lawyer, businessman, and president of the corporation he won her trust and that she reposed both in his honor and his judgment a high degree of confidence.

As to defendant Erickson, the evidence is sufficient, at least for the purposes of a civil action, to charge him with fraud from beginning to end. According to plaintiff's testimony, he persuaded her to sell her Northern States stock which, as far as the evidence shows, was a dependable payer of dividends (and all defendants. all the time must be taken, on the evidence, as charged with knowledge that an assured and steady income was plaintiff's imperative need and objective) upon the representations that because "Jews were getting into" the Northern States Power Company, and for other similar reasons, it was "losing out," and so she should sell that stock. The falsity of such representations is shown. There is no pretense otherwise.

The evidence does not at this point, nor anywhere explicitly, connect defendant Sterling, nor through him the Union company, with complicity in the guilt of Erickson. But it does show close and constant collaboration between Johnson, a licensed salesman of the Union company, Erickson, and Sterling. In fact, the two former were not able to sell Union stock to plaintiff until they had brought

about an interview between her and Mr. Sterling, whose arguments were such as to complete the transaction in April of 1929.

It is argued that so far there is no proof of actionable fraud; that the Union stock was then worth all plaintiff paid for it (there is no proof to the contrary) ; and that plaintiff without objection kept that stock for a length of time during which dividends of seven per cent were regularly paid. Even if otherwise factually well founded, that argument is of no help to defendants if there was the conspiracy and joint action claimed by plaintiff and the results to her financially which her evidence tends to show.

In May, 1930, again through the collaboration of defendants Erickson and Sterling, the sale to plaintiff of the North Central Corporation stock for $4,700 was consummated. Again there is argument for defendants, which it may be assumed has the factual foundation assigned, that there is absence of proof that the stock was not at the moment worth what plaintiff paid for it.

Defendants would not, or at least did not, let plaintiff alone. It may be that the next step by defendant Sterling, about to be related, was suggested by the fact that he was ousted as president of the North Central Corporation. It may even be that here and elsewhere in the series of involved transactions his motives were above reproach. But we are not the triers of fact, and the thing fatal to the claims of both Mr. Sterling and the Union company is that there is evidence to support plaintiff's claim of conspiracy and fraud.

In the next "deal," which resulted in her surrender of her North Central stock, she was approached by defendant Sterling, upon the representation, so she testified, among other things, that "he was looking out for the widows," and that from the standpoint of her interests and especially her need for income it would be advisable for her to make the change recommended and which he accomplished, namely, that she take the St. Andrews Hospital bonds, of the face value of $2,500, and the Central Public Utility Corporation bond, of the face value of $1,000, in exchange for her North Central stock. She did that. And there is abundant evidence to show that what she got in exchange was at the time being of small value—

whether more or less than the then value of the North Central stock the record does not indicate. There is evidence for plaintiff that the hospital bonds were of slight, if any, value, and that the "utility bond" with a face value of $1,000 was then quoted on the market at not to exceed $65. Neither, at the time being or later, assured income for plaintiff. Whatever he may have told plaintiff about these bonds, there is no claim that Mr. Sterling made to plaintiff that full and complete disclosure of the deleterious factors in these bonds to which she was entitled. Even the testimony of Mr. Sterling himself, by so much, fails to show the performance to plaintiff of the duty of complete and truthful disclosure which the jury could well have found, and doubtless did find, rested upon him.

The final "deal" was engineered by defendant Erickson with the aid of one or two others of the same school of business ethics. In November, 1932, they persuaded plaintiff by representations, as to the fraudulent character of which there can be no doubt if they were as the evidence indicates they were, to exchange all her Union Loan Company stock (for which she had paid more than $11,400) for the lots in Superior, Wisconsin, and the mortgage on certain other lots in the same locality already mentioned. Defendant Erickson was the maker of the note secured by the mortgage. He took title to the lots for the sole purpose of mortgaging them to plaintiff, with no intention of ever paying anything on the principal or interest, although a little later he did make a small payment of interest. The Great Lakes-St. Lawrence Waterway project was the main inducement which Erickson magnified many times in getting plaintiff to make the exchange. We repeat that his own testimony is hardly susceptible of any other construction than that this "deal" was a fraudulent device to get from plaintiff her something (the then value of the Union stock) for his next to nothing. (The evidence shows that the Superior lots and mortgage were of little value.)

How is defendant Sterling connected by evidence with this noisome transaction? There is testimony that he called upon a trusted friend and adviser of plaintiff recommending that she make the exchange. (He denies it.) There is no evidence that this con-

versation was communicated to plaintiff before the contract of exchange was executed. But the evidence was relevant notwithstanding on the issue of conspiracy. In view of the collaboration between Erickson and Sterling in getting plaintiff to surrender good securities for others next to worthless, it cannot be said that evidence of Mr. Sterling's intrusion into the Superior lots transaction was not properly admissible. Nor is it arguable that, coupled with the clear evidence of Erickson's fraud and the indicia of conspiracy between Erickson and Sterling, the evidence in sum was not sufficient (under the authorities cited later) to warrant the verdict, which must have for its adequate support evidence of both fraud and conspiracy to defraud.

Nor can the Union Loan Company escape. True, there is no evidence of express authority given by it to its president, Sterling, or anybody else to defraud plaintiff. Such projects are not made the subject of express authority. Their existence is shown, if at all, by circumstantial evidence. There is direct evidence that defendant Sterling had exclusive charge of selling the Union company stock. There is also explicit evidence that he directed its policies. There, possibly, the direct evidence stops. But not so the circumstantial. For within 30 to 60 days after Erickson had taken from plaintiff all her stock in the Union company, substantially all of it had got back into the hands of the company and was retired. It is plain that Erickson had no intention of acquiring it for himself. So if the fact be that the corporation was innocent and no party to a conspiracy, there is yet this evidence that speedily it reaped most of the benefit of the nefarious trade by which plaintiff was finally stripped of the remnant of her estate.

Thus we see that plaintiff's theory has enough support of evidence to warrant the verdict confirming it. That theory is, in short, that beginning with plaintiff's purchase in 1929 of her first large block of Union company stock, in connection with which she was prevailed upon to surrender her Northern States Power Company stock, there was a fraudulent design, fabricated and accomplished by defendants in concert, to deprive her of that security of an established value and dependable income-producing power and substitute

for it other properties, which she now has and which are of relatively small value. For such value as plaintiff has got out of her series of transactions with defendants the verdict makes generous allowance.

■ The evidence for plaintiff justifies a finding that she imposed a special trust and had great confidence in Mr. Sterling. In converting her Central Corporation stock into the bonds of the St. Andrews Hospital and Central Utility Corporation she had assurance, so she testified, that Mr. Sterling was attempting to "look out" for her because of her widowhood. That aside, Mr. Sterling at the time was a man of both professional and political prominence in the community. He had held important public office. He knew or at least should have known that, for some reason or other, after plaintiff's initial purchase of 12 shares of Union company stock, she would not buy more without meeting him and getting his assurance as to the then condition of the company and its prospect as a dividend payer. He, Erickson, and all the others must have known that plaintiff was not in a position to speculate; that she should take no avoidable chance of loss or impairment of her capital, and that, because of her age and inexperience in business affairs, she could be easily victimized. Through lack of understanding, she could be easily deceived by persons intending no deceit. No standard of ethics is so low as to require from any man, dealing with such a woman, anything less than a high degree of care for her protection.

Mr. Sterling is a lawyer. For the time being he had permitted himself to become the "front" for the Union company in its stock-selling campaign. That was a dangerous position for him. With his activities and obligations as a lawyer, he had combined a stock promotion enterprise. To make him liable to plaintiff it is not necessary that he should have intentionally invited her confidence. A lawyer of his experience must have known that he was in a position to get, whether he wanted it or not, the trust of persons, in the category of plaintiff, with small capital, small income, and eagerness for more of both. It matters not how a person in the position of Mr. Sterling in respect to interests such as those of plaintiff gets it. When once such confidence is reposed, it must

be respected and "preserved from any intermixture of imposition." Such influence, so acquired, "must be kept free from the taint of selfish interests." Overreaching is barred. In re Malchow, 143 Minn. 53, 58, 172 N. W. 915, and authorities cited. Our cases are collected at 3 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 3833.

That rule operates alike on layman and lawyer. But the latter should always realize his professional duty and never forget the standing he has acquired. In proportion to both does he tend to attract confidence. In this case, aside from Mr. Sterling's position as president of the Union company and his established place as a lawyer, there was the personal contact and the resulting and very natural tendency of plaintiff to depend and act upon any suggestion or advice of Mr. Sterling. Under the authorities, there was no error in submitting to the jury the question whether plaintiff had placed in Mr. Sterling a high degree of trust. The affirmative answer implicit in the verdict is sustained by the record.

The submission to the jury of this issue did not violate the rule that "a director or officer [of a corporation] does not stand in a fiduciary relation to a stockholder in respect to his stock, and has the same right as any other stockholder to buy stock from or sell stock to another stockholder." Seitz v. Frey, 152 Minn. 170, 174, 188 N. W. 266, 268. The issue arose and went to the jury in this case because of the special circumstances which we have noted and which made its submission proper.

■ What has just been said operates also against the Union company. It selected a prominent lawyer as its president, and went to the public in a stock-selling campaign on the indorsement attending the use of his name. It cannot thereafter, merely by pleading its separate entity, escape liability to those who have suffered pecuniary loss, as plaintiff here claims to have done, through much trust properly reposed in the lawyer-president, in the transaction of the corporation's business, and for its profit. If corporations, in their promotion schemes, must have lawyers as presidents and their stock-selling campaigns recommended by the personality and professional standing of the lawyer, they must take him *cum onere*. Theirs is the liability that may arise in favor of unsuspecting and

deceived purchasers of securities, whose entrapment has been effected by the very confidence attracted (and usually wanted) by the personality of the lawyer-president. If in transaction of the company's business by the lawyer-president, such confidence is gained, and abused to a plaintiff's damage, the corporation as well as the president is liable. The case in sum is simply this. Aided by his own standing and personality, the president has committed a tort in the transaction of his principal's business, that of the corporation. Both are liable, the corporation under the simple rule of *respondeat superior*. Melady v. South St. Paul Live Stock Exchange, 142 Minn. 194, 171 N. W. 806. See 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 2022.

■ The record sustains the charge of conspiracy. The apparent separation by time, and otherwise, of the several transactions is an argument to the contrary, but not of sufficient weight to destroy the support there is for the verdict. In plaintiff's purchase in April, 1929, of 159 shares of preferred and 62 shares of common Union stock, there is no evidence that either the corporation or Mr. Sterling was a party to the fraud of Erickson. But plaintiff was then found to have some money and to be a likely customer. From then on none of the defendants would let her alone. She was persuaded to pay cash for her North Central Corporation stock, Sterling and Erickson working together to bring about the deal. The conversion of the stock into the hospital and utility bonds was engineered by Sterling. Finally, we find him, some evidence indicates, indorsing the plan to get plaintiff into the malodorous Superior lots venture.

Conspirators do not make minutes of their machinations, progress, and objectives. Seldom, therefore, can conspiracy be proved by other than circumstantial evidence. It is only by assembling the results, with such evidence as may be of the progress thereto by the participants, that the victim can ever make a case of conspiracy. If in the end there is a completed structure of result, the frame of which has been furnished piecemeal by several individuals, the parts when brought together showing adaptation to each other and fitness for the end accomplished, it is at least reasonable to

infer concert in both planning and fabrication. Compare Lange v. Heckel, 171 Wis. 59, 68, 175 N. W. 788, 791, stressing the need in reviewing such cases for giving the evidence "every legitimate construction most favorable to plaintiffs' contentions," with deductions "such as practical men of affairs might reasonably draw therefrom." Plaintiff's case is within the rule of Sherman v. Minnesota Mut. L. Ins. Co. 191 Minn. 607, 255 N. W. 113, that "it is sufficient if reasonable minds may conclude from the circumstances that the theory adopted by the verdict outweighs and preponderates over any other."

As stated, the treatment received by plaintiff from defendant Erickson was wrongful from start to finish. At the very beginning, we have plaintiff's testimony of his misrepresentations of flagrant character. His denials were rejected by the jury. They could not reasonably have done otherwise in view of his admitted participation in prevailing upon a credulous, aged, and deaf widow to invest in "Superior Lots" on the representation, among other things, that they would soon increase in value under the stimulus of the St. Lawrence Waterway, a scheme which still remains in the realm of myth and the promises of office seekers. In that closing transaction there was so much obvious fraud as to besmirch every participant, from beginning to end, within reach of the resulting inferences.

Inferences reasonably drawn from proved circumstances are not given direction forward, backward, or laterally, nor limited as to time or persons, by any rule, legal or logical. A given transaction may shed much light on things to follow. It may equally illumine past events and disclose participants and purposes theretofore unsuspected.

That consideration, applied to this record, makes it impossible for us, after a jury has found otherwise, to disconnect either defendant Sterling or the Union company from the fraud practiced upon plaintiff. The participation of both began early and continued to the end. At least plaintiff's evidence so indicates. The indicia of coöperation in a common purpose, that of exploiting plaintiff, are too numerous and persuasive to permit us to say that as matter of law the verdict lacks the adequate support of evidence. It is im-

material that defendants Sterling and Union Loan Company may not have been participants in the wrongful purpose at its inception. It is enough if there is evidence, as there is, that before its consummation, each of them actively participated in the common design. Silliman v. Dobner, 165 Minn. 87, 205 N. W. 696. If a fraudulent plan is conceived and for a time carried on by one wrongdoer and later others join and participate in its accomplishment, there is a conspiracy as to all of them. Of course, the gist of the civil action of conspiracy is the damage. But the thing which characterizes it is the community of purpose and action plus the intended result. No express or certain agreement is necessary. A common understanding to commit the wrong is enough, even though the purpose and assignment of parts to the several actors be tacit. Drexler v. Zohlen, 216 Wis. 483, 257 N. W. 675.

■ There is argument that because plaintiff kept her Union company stock for something like three years and drew dividends thereon all the time she is estopped from repudiating the purchase of that stock. The answer is that she is not trying to repudiate that transaction. She is pursuing the quite distinct remedy of an action for damages based upon that and other transactions which she claims, and the jury found, to have been related. Plaintiff must be taken as having been ignorant of the wrong, which the jury found was perpetrated upon her, until after she discovered how little of substance and how much of the "blue sky" of swindlers' promises was in the inducement for her taking on the "Superior Lots" transaction. Estoppel cannot be pleaded successfully against one ignorant of the facts, knowledge of which is necessary to enable the one to be estopped to make an intelligent election of remedies or the course otherwise to be followed.

During all the time plaintiff was receiving benefits from her Union stock, she was unaware that there had been any misconduct on the part of defendants or any of them. The dividends were not accepted with knowledge of the true situation, as plaintiff's evidence later made it appear. Hence she is no fair target for an estoppel. Dickinson v. Citizens I. & F. Co. 139 Minn. 201, 165 N. W. 1056, is on the affirmative rather than the negative side of

the problem. There the estoppel was successfully invoked against a corporation because it had complete knowledge of the essential facts when it made the involved stipulation (which it was attempting to avoid) and later and with such knowledge accepted the benefits. Obviously, it was properly subjected to an estoppel. Just as plainly plaintiff here, because completely in the dark as to what was going on, cannot be barred by estoppel from asserting her cause of action for damages.

In both appeals the orders under review are affirmed.

Mr. Justice Loring took no part in the consideration or decision of this case.

