# EVELYN NATHAN v. ST. PAUL MUTUAL INSURANCE COMPANY.

86 N. W. (2d) 503.

November 22, 1957—No. 37,003.

*Lowell W. Benshoof* and *P. F. Schroeder,* for appellant.

*Henry Halladay, Curtis L. Roy,* and *Dorsey, Owen, Barker, Scott & Barber,* for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order denying plaintiff's motion for judgment notwithstanding the verdict or for a new trial.

The case arises out of the destruction by fire of a multiple-unit dwelling house located in the village of Fosston, in this state, on January 27, 1952. This is the second appearance of the case before us. In the first appeal, we granted a new trial because of errors in admitting evidence of the value of the insured property at or prior to the time of the issuance of a "valued policy" under our statute. Nathan v. St. Paul Mutual Ins. Co. 243 Minn. 430, 68 N. W. (2d) 385. Some of the defenses advanced by the insurer in the first trial were abandoned upon retrial. In addition to other defenses alleged, the insurer amended its answer by setting up as a defense that the insured building was destroyed by fire of an incendiary origin attributable to plaintiff or that said fire was caused by or with the consent or knowledge of plaintiff or her agents. Essentially, defendant's contentions on the second trial are: (1) That plaintiff did not have an insurable interest in the property; (2) that subsequent to the issuance of the policy plaintiff committed or permitted acts to be done which materially increased the risk of loss contrary to the provisions of the policy; and (3) that the insured building was destroyed by a fire of incendiary origin attributable to plaintiff or caused by or with the knowledge of plaintiff or her agents, thereby increasing the risk of loss.

While much of the evidence is very much in conflict, the facts which reasonably might have been found by the jury essential to a determination of this appeal are as follows:

Plaintiff first became acquainted with one C. O. Balcomb in the latter part of 1937. Thereafter followed a close business and personal relationship until the death of Balcomb shortly prior to the first trial. For some time prior to 1945, plaintiff and Balcomb operated a hotel in Portage, Wisconsin, ostensibly owned by plaintiff. Plaintiff then moved to Minnesota, residing in Bagley and Bemidji, during which

time she operated a food-storage locker plant in Fosston and engaged in other business enterprises. In May 1949, she moved to Fullerton, Nebraska, where she again operated a locker plant. In all of these enterprises, the jury could find from the evidence, Balcomb was closely associated in one way or another.

The land on which the insured building was located was originally owned by one Andrew Johnson. The negotiations for the purchase were conducted by Balcomb. A contract for deed was drawn by a banker in the village of Fosston, and plaintiff's name was inserted as vendee at the request of Balcomb. Balcomb paid the purchase money, although plaintiff claims that it was her money which he used.

The house itself originally was on a farm owned by one Carl V. E. Carlson. Negotiations for the purchase of the house likewise were conducted by Balcomb. A bill of sale was drawn by the same banker in Fosston who had drawn the contract for deed, and again Balcomb requested that plaintiff's name be inserted as purchaser. Plaintiff was not present when the bill of sale was executed. Balcomb paid the purchase price, partly in cash and partly by a check which he drew on a joint account carried in the name of himself and plaintiff. The house thereafter was moved to the lot previously purchased. Balcomb made all the arrangements for moving the house and placing it on this lot. The total purchase price for the house and lot was $2,750. An addition later was built on the house.

Plaintiff never lived in this house. It was occupied from time to time by tenants who were permitted to move in by an individual who apparently worked for plaintiff or Balcomb in the operation of the locker plant in Fosston. Plaintiff never collected any rent. Balcomb moved into one of the apartments in 1951. Plaintiff visited him there on a few occasions and stayed in the apartment which he occupied. In May 1950, plaintiff wrote a letter to one Victor Johnson at Rio, Wisconsin, in which, among other things, she said:

"Just had a letter from Mr. Balcomb and has to raise $5000.00 by May 15, which he can do easy enough up here, but he would rather deal with you altogether.

"We could pay you $2500.00 in a year and $2500.00 the next year

"*He* wants to give you additional security on the big House at

Fosston Minn, *he* has that all completed now is bringing *him* $125.00 a month out of the four apartments

"He wants this money to move the locker plant out of Bellevue Neb. as it is not makeing [sic] him any money down there.

"The insurance on the house is paid up for 3 years and it is for $12,000.00.

"*He* is haveing [sic] the abstract & deed of the place brought up to-date, * * *." (Italics supplied.)

Plaintiff applied for and obtained fire insurance in the principal amount of $12,000 on this property from an agent of defendant at Bemidji, Minnesota. The policy contained a provision that it would be void if "the risk shall, by or with the knowledge, advice, agency, or consent of insured be so altered as to cause an increase of such risks, * * *."

After Balcomb moved into the house he installed an oil stove in one of the apartments thereof, which he occupied. Thereafter, oil began to accumulate on the floor to such an extent that the floor, some grain sacks, and rugs became soaked with fuel oil. Later it accumulated sufficiently so that it ran under the door out into the hall. About a month before the fire he installed a stove in the basement and thereafter hired some local men to chop up some wood and refuse, some of which was too long to burn in the stove, which was piled near the stove and up to within 18 inches or 2 feet of the ceiling near the staircase. Excelsior, oily rags, and roofing material containing tar were also in this pile.

In November 1951, Balcomb brought an unlawful detainer proceeding against one of the tenants in the building. In that action he testified that he was the owner of the building. He offered to sell the building to another tenant. The plumbing froze, and the water had to be shut off. The building was allowed to deteriorate in several respects.

About a week after the last tenant had moved out of the building, Balcomb went to a hardware store at Fosston and purchased a gallon of solvent alcohol, a plug, a socket, a length of light cord, and a light bulb. He told the hardware dealer that he wanted the alcohol for use in painting as he did not like the smell of turpentine. The jury could find from the evidence that at that time he was doing no painting in the

building. Several days before the fire he had the oil stove repaired and replaced and the stove in the basement replaced with an "air tight" stove which burned wood. A deputy fire marshal for the State of Minnesota testified that the material he purchased at the hardware store could be used to start a delayed fire by placing the light bulb in a basket or box containing inflammable matter soaked in alcohol. He stated that such an arrangement will start a spontaneous combustion within 4 to 12 hours and that it is one of the methods whereby delayed fires are started.

Balcomb was seen entering the house the day before the fire. The next morning he was in Fullerton, Nebraska, which is 500 miles from Fosston.

A witness testified that he saw thick, oily smelling smoke coming from the building about 3 a. m. The fire was actually discovered about 8 a. m., and the flames were then coming from a window in the southeast apartment, the one occupied by Balcomb.

Plaintiff and Balcomb, over a number of years, had borrowed quite heavily from Victor Johnson, who resided at Rio, Wisconsin. While plaintiff testified that, prior to the fire, she had deeded the locker plant in Fosston to Johnson in full satisfaction of the amount she owed him, there is evidence from which the jury could find that plaintiff and Balcomb were still indebted to Johnson at the time of the fire. Johnson testified that on December 30, 1951, plaintiff and Balcomb called at his home in Rio and tried to borrow more money from him but that he refused. He further testified that Balcomb said, in the presence of plaintiff, that next month he was going to have the tenants "moved out" and that "Evelyn [referring to plaintiff] will have a fire up there, the last Sunday in January, and she's also making plans to have me come up there Wednesday, following that Sunday, and she'd be paying me off them notes that she owed"; that Balcomb asked plaintiff if that was right and she said: "yah, that's right." He also testified that Balcomb told him to "stick around" on the last Sunday in January and they would telephone him; that on that Sunday he talked to both Balcomb and plaintiff over the telephone, he being in Rio and they in Fullerton, Nebraska; and that at their request he agreed to meet them in Fosston the next Wednesday. Plaintiff admitted that she

and Balcomb traveled to Fosston a few days after the fire and that Johnson was there when they arrived, but she denied ever being in Rio in December 1951 or talking to Johnson, as he had testified. The last tenant to move out of the building, who moved shortly before the fire, testified that at the time oil was accumulating on the floor of Balcomb's apartment he asked Balcomb if he was "trying to burn us out" and Balcomb said "you can't prove nothing."

The fire occurred on Sunday, January 27, 1952. After it was discovered, the man who looked after the property telephoned plaintiff's home in Fullerton and advised her of the fire. That occurred in the early morning of January 27. Johnson testified that he was called by telephone about noon of the same day.

The jury returned verdicts for defendant in both trials.

Plaintiff contends on this appeal: (1) That the court erred in admitting conversations of third persons not in the presence of plaintiff and not shown to be with her knowledge and consent in proof of ownership or insurable interest or in proof of increase of risk or incendiarism; (2) that the court erred in · admitting evidence of the actions of third parties not in the presence of plaintiff or with her knowledge or consent in proof of insurable interest other than in plaintiff and in proof of increase of risk; (3) that the court erred in admitting the opinion of a deputy fire marshal as proof of increase of risk or incendiarism; (4) that defendant's counsel was guilty of prejudicial misconduct; (5) that the court erred in its instructions on controlling principles of law; and (6) that newly discovered evidence should require a new trial.

At the outset, it is apparent that the case was submitted to the jury on the theory that, if it found that plaintiff did not have an insurable interest in the property or if, by her acts, she had increased the risk of loss, the verdict should be for defendant. Inasmuch as the verdict was a general one, it is impossible to tell upon which of these separate defenses the jury based its verdict. Error as to either defense or insufficiency of the evidence to sustain either must therefore lead to a new trial.[1]

---

[1] Zane v. Home Ins. Co. 191 Minn. 382, 254 N. W. 453; Lindemann v. Chicago, R. I. & P. Ry. Co. 154 Minn. 363, 191 N. W. 825.

■ On the issue of insurable interest, plaintiff contends that it was error to admit conversations of third persons not made in the presence of plaintiff as to the ownership of the property. The errors assigned, which are argued in plaintiff's brief, relate to statements alleged to have been made by Balcomb to the municipal judge at Crookston in an unlawful detainer action brought against a tenant in the building to the effect that he was the owner of the house and to statements made by Balcomb to a tenant by the name of LaBlackie in an effort to sell the home to him. Statements made by a person in possession of property as to ownership are admissible to show the character of his possession.[2]

The issue was whether plaintiff had an insurable interest. She has asserted no interest other than as owner of the property. Defendant claims that Balcomb was the owner and that plaintiff's name was inserted in the contract for deed to the land and the bill of sale covering the house as a convenience to Balcomb but that she had no interest in the property. Balcomb was in possession of the property. It follows, therefore, that statements made by him at the time the instruments were executed, as well as statements made at times when he asserted control over the property, were admissible as verbal acts characterizing his possession.[3]

■ As a separate defense, defendant alleged "that the frame building located on the land * * * was destroyed by fire of an incendiary origin attributable to the plaintiff, or that said fire was caused by or with the consent or knowledge of plaintiff or her agents * * *."

The evidence shows a close relationship between plaintiff and Balcomb running over a period of many years. It is admitted that plaintiff was in Fullerton, Nebraska, at the time the fire occurred and could not have had an active personal part in starting it. The answer, as well as the briefs submitted here, has much to be desired by way of presenting the issue of incendiarism, but we think that the allegation in

---

[2] Rosenberg v. Burnstein, 60 Minn. 18, 61 N. W. 684; Brown v. Kohout, 61 Minn. 113, 63 N. W. 248; Pennig v. Schmitz, 189 Minn. 262, 249 N. W. 39; 6 Wigmore, Evidence (3 ed.) § 1779; see, also, Fredin v. Richards, 66 Minn. 46, 68 N. W. 402.

[3] 6 Wigmore, Evidence (3 ed.) § 1779.

the answer quoted above can reasonably be construed, and that from the evidence it reasonably appears, that the case was tried on the theory that the fire occurred as the result of a conspiracy between plaintiff and Balcomb to destroy the building for the purpose of collecting the insurance thereon. We shall so consider it in connection with the claimed errors relating to the admission of evidence on the issue of incendiarism.

A conspiracy may be proved by circumstantial evidence.[4]

■ Ordinarily, evidence of acts or declarations of a coconspirator should not be admitted until a prima facie case showing the existence of a conspiracy has been established by evidence apart from such acts and declarations, but the order of proof is a matter within the discretion of the trial court, and, if a conspiracy is subsequently proved, there is no error.[5]

■ In establishing a conspiracy, it is enough if the circumstances shown warrant an inference of concerted conduct.[6]

In Scheele v. Union Loan & Finance Co. 200 Minn. 554, 563, 274 N. W. 673, 678, we said:

"Conspirators do not make minutes of their machinations, progress, and objectives. Seldom, therefore, can conspiracy be proved by other than circumstantial evidence. It is only by assembling the results, with such evidence as may be of the progress thereto by the participants, that the victim can ever make a case of conspiracy. If in the end there is a completed structure of result, the frame of which has been furnished piecemeal by several individuals, the parts when brought together showing adaptation to each other and fitness for the end accomplished, it is at least reasonable to infer concert in both planning and fabrication."

■ Once a prima facie case of conspiracy has been established,

---

[4]Silliman v. Dobner, 165 Minn. 87, 205 N. W. 696; National Ben Franklin Fire Ins. Co. v. Stuckey (5 Cir.) 79 F. (2d) 631; State v. Townley, 149 Minn. 5, 182 N. W. 773, 17 A. L. R. 253; Jakula v. Starkey, 161 Minn. 58, 200 N. W. 811.

[5]State v. Kahner, 217 Minn. 574, 15 N. W. (2d) 105, certiorari denied, 323 U. S. 768, 65 S. Ct. 121, 89 L. ed. 614.

[6]State v. Anderson, 155 Minn. 132, 192 N. W. 934.

the acts, statements, and conduct of each of the conspirators in execution or furtherance of the common purpose may be shown as evidence against the other.[7]

In State v. Kahner, 217 Minn. 574, 581, 15 N. W. (2d) 105, 109, certiorari denied, 323 U. S. 768, 65 S. Ct. 121, 89 L. ed. 614, this rule is well stated as follows:

"Everything said, written, or done by a conspirator in execution or furtherance of the common purpose to commit a crime is deemed to be the act of every party to the conspiracy, whether present or absent, and is admissible as evidence against each of them. The combination need not be established by direct proof. No formal agreement to commit the acts charged need be shown. The existence of the combination or conspiracy may be inferred from other facts proved. If the other facts proved show that the defendants, by their acts, pursued the same object, often by the same means, one performing one part and another another part of the same so as to accomplish a common purpose, the existence of the conspiracy is one of fact."

We have applied the same rule in cases involving a tort where the tortfeasors act in concert to consummate a wrongful act.[8]

The evidence here establishes a prima facie case of a conspiracy or at least of a common plan on the part of plaintiff and Balcomb to destroy the property by an incendiary fire. If the testimony of Victor Johnson is believed, the proof is well-nigh conclusive. Plaintiff argues that Johnson's testimony is so far impeached as to be unworthy of belief. There is much to be desired in the testimony of Johnson. On the other hand, there is considerable evidence to corroborate his testimony. His testimony is not so inherently improbable that it can be said

---

[7]Nicolay v. Mallery, 62 Minn. 119, 64 N. W. 108; St. Paul Distilling Co. v. Pratt, 45 Minn. 215, 47 N. W. 789; 7 Dunnell, Dig. (3 ed.) § 3411a; State v. Zabrocki, 194 Minn. 346, 260 N. W. 507; State v. Tennyson, 212 Minn. 158, 2 N. W. (2d) 833, 139 A. L. R. 987; 4 Wigmore, Evidence (3 ed.) § 1079; National Ben Franklin Fire Ins. Co. v. Stuckey (5 Cir.) 79 F. (2d) 631.

[8]Matesic v. Maras, 177 Minn. 240, 225 N. W. 84; Rockwell v. Rockwell, 181 Minn. 13, 231 N. W. 718; Robyn v. White, 153 Minn. 76, 189 N. W. 577.

that the jury was compelled to disregard it as a matter of law. The credibility of this witness was clearly for the jury. In view of the fact that a prima facie case of conspiracy or a common intent, of which plaintiff was a party, has been proved, there was no error in admitting evidence of acts, statements, and conduct of Balcomb in furtherance of the common purpose and in the execution of the plan.

◼ Plaintiff contends that it was error to permit evidence of the physical condition of the house under our decision in the first appeal of this case. Nathan v. St. Paul Mutual Ins. Co. 243 Minn. 430, 68 N. W. (2d) 385. In that case we did hold that in an action to recover on a "valued policy" under our statute (243 Minn. 436, 68 N. W. [2d] 390):

"* * * the nature, use, and condition of a structure which reasonably are discoverable by an inspection at the time the fire insurance policy is issued or renewed cannot be shown by the insurer as proof that, relative to those matters, the insured committed intentional fraud or misrepresentations increasing the risk of loss."

In the first trial, incendiarism was not interposed as a defense. Here, proof of deterioration of the building; its unfitness for occupancy; and its depreciation in value all were admissible in proof of a motive for intentional destruction of the building in order to collect the insurance thereon. Similarly, proof of the financial condition of those who would profit from a destruction of the building is admissible to establish motive.[9] In view of the defense of incendiarism, it was not error on this trial to admit evidence showing the deteriorated condition of the building at the time of the fire.

◼ When a prima facie case of conspiracy or a common purpose on the part of plaintiff and Balcomb to destroy the building by fire was established, the question of whether the acts of Balcomb in furtherance of this common purpose increased the risk of loss so as to effect a forfeiture of the insurance policy properly was submitted to the jury.

◼ Defendant called as one of its witnesses Clarence A. Cherry, a

[9]State v. Lytle, 214 Minn. 171, 7 N. W. (2d) 305.

deputy fire marshal for the State of Minnesota. Based on a hypothetical question assuming the truth of facts which the jury could find from the evidence, he stated that in his opinion the acts and conduct of Balcomb with respect to the occupancy and use of the building would increase the risk of loss by fire. His opinion was as follows:

"* * * if fuel oil was spread and left on the floor close to the space-heater in the southeast bedroom with oily rags and burlap sacks, if that condition existed as I have heard here, and if wood was piled closely with excelsior and oily rags in the basement, especially under a fire hazard stairway which would be a serious fire hazard, then, if left in that condition, it would certainly create a serious hazard, and could ignite the home.

    *   *   *   *   *

"Q. On the direct question of whether these questions as I asked you to assume to be the case as you have described them, what is the simple answer as to whether there was an actual increase in the rate of loss by fire, was there an actual increase in the risk of loss by fire?

"A. Yes, if those conditions existed there would be, yes."

He was then asked the following questions, to which he gave these answers:

"Q. Mr. Cherry, from your experience and training in investigation of arson, do you know of a method involving the utilization of an electric lamp cord, a plug, a socket, a light bulb, solvent alcohol for the purpose of starting a delayed action fire?

    *   *   *   *   *

"A. Yes, I do.

    *   *   *   *   *

"Q. What would that method be?

"A. It would be lamp cord or any kind of wiring connected to a bulb, put in a paper box or any kind of a wood box or basket saturated with cut papers or rags, oil or any solvent that was highly explosive and would spontaneous combustion would take place from four to twelve hours.

"Q. Have you seen experiments involving the use of those elements that have been described here as a plug, socket, light cord or

lamp cord, and such things away—a fifteen-cent light bulb together with solvent alcohol under circumstances that you have described?

"A. I have seen that done at the University at our seminar, I saw a man, a chemist from Detroit, Michigan, Mr. Webber, showed us several delayed action sets and that is one of them.

"Q. Now, would solvent alcohol be one of the types of fluids used in such a situation?

"A. It could be."

Mr. Cherry's qualifications as an expert in the field of detecting fires of an incendiary origin are not challenged. His experience in this field, of course, was far superior to the knowledge of the jurors. His opinions were directly related to his training and based upon a utilization of his superior knowledge in that field, together with an assumption of the truth of facts the jury could find from the evidence in the case. Under these circumstances, it clearly was within the discretion of the trial court to permit him to state his opinion in order to assist the jury in arriving at a correct conclusion. We see no error in this connection.

■ Plaintiff next contends that defendant's attorney was guilty of such misconduct during the trial as to require a new trial. During the cross-examination of plaintiff, counsel for defendant asked her whether she had had trouble about insurance on her locker plant and if the insurance on it had not been canceled. She answered "Not that I know of," before her counsel could interpose an objection. Thereafter an objection was interposed and sustained by the court. No motion to strike was made. She was then asked:

"Before this particular fire that destroyed the house at Fosston, Mrs. Nathan, had you ever had any fires in any properties occupied or managed or occupied by you?"

The court sustained an objection to that question, and it was not answered. She was next asked: "Was there a fire in that house at Bagley?" and she answered: "No, there was not." A motion to strike the answer was denied on the ground that it was negative. The matter was not pursued further. Plaintiff did not request any protective instruction

from the court. In its general charge to the jury the court did caution the jury:

"* * * As to any offer of evidence that has been rejected by the Court, you, of course, must not consider the same but as to any questions which an objection was thereto made and sustained you must not conjecture what the answer might have been or what the reason was for the objection."

While these questions were improper, we do not think that they were so prejudicial as to require a new trial. Apparently plaintiff did not think so at the time of the trial; neither did the trial court so believe. If any harm was done, we think that the court's instruction, in the absence of a request for a more specific instruction by the party claiming the error, was sufficient.

■ Plaintiff attacks the instructions of the court mainly on two points, one of which was that it was error to charge the jury that, if it found by a fair preponderance of the evidence that plaintiff had so altered the building as to increase the risk of damage or loss, the policy would be void. It is plaintiff's claim that there was no evidence that there were any changed conditions which would warrant the giving of this instruction. An examination of the record discloses much evidence which, if accepted by the jury, would warrant the giving of the challenged instruction. The manner of occupancy; the apparent intentional saturation of a part of the building with fuel oil; the manner of installation of stoves; and the accumulation of wood and other inflammable material in the basement in a location which well could have been calculated to quickly create a fire of considerable proportions were sufficient alone to justify the giving of this instruction. Added to this is the evidence from which the jury could find a deliberate plan for starting a delayed-action fire which actually was carried into execution.

The other instruction complained of relates to the ownership of an insurable interest by plaintiff. The only claim made by plaintiff was that she was the owner of the property. The evidence on this issue was clear-cut that either she owned it or that Balcomb owned it. We have examined the instructions on this issue and find no error. It is elementary that the instructions of the court must be read as a whole,

and, when that is done, we are convinced that there was no error. Apparently the instruction was satisfactory to both parties at the time of the trial. No objections or exceptions were noted, and the attorneys for both parties indicated their satisfaction with the instruction as given.

Finally, plaintiff seeks a new trial on the ground of newly discovered evidence. Victor Johnson testified that plaintiff and Balcomb were in Rio, Wisconsin, on December 30, 1951, and, as related above, he stated that they indicated at that time that there would be a fire in this house. On her motion for a new trial, plaintiff submitted an affidavit by an attorney in Omaha, Nebraska, that he had conferred with plaintiff as late as the afternoon of December 29, 1951, and that he talked with her on the telephone that evening after she had returned to Fullerton, Nebraska. Fullerton, Nebraska, is about 500 miles from Rio, Wisconsin, and it is about the same distance to Fosston, Minnesota. The evidence shows that Balcomb was in Fosston the day before the fire and in Fullerton the next morning. Even if Balcomb and plaintiff had been in Fullerton on the evening of December 29, there appears to be no reason why he could not have driven to Rio by the morning of December 30 as well as he could drive from Fosston to Fullerton in approximately the same time. Much of the affidavit submitted in support of the motion for a new trial on the ground of newly discovered evidence is based on information and belief. At best, it is only corroborative of other testimony intended to refute the testimony of Victor Johnson. The matter of granting a new trial for newly discovered evidence lies largely in the discretion of the trial court. We can find no abuse of discretion in that regard in this case.

We have carefully examined the entire record. The questions presented were fact questions. We find no prejudicial errors which would warrant the granting of a new trial. The evidence amply sustains the jury's verdict on both of the main issues submitted to it.

Affirmed.