## BROOKS REALTY, INC. v. AETNA INSURANCE COMPANY AND OTHERS.

149 N. W. (2d) 494.

March 23, 1967—No. 40,050.

*Dorsey, Owen, Marquart, Windhorst & West, Henry Halladay,* and *Curtis D. Forslund,* for appellants.

*Robins, Davis & Lyons, Solly Robins,* and *Harding A. Orren,* for respondent.

KNUTSON, CHIEF JUSTICE.

This is an appeal from a judgment.

The case arises out of the partial destruction by fire of a building in Minneapolis on February 17, 1962. The building was owned by Brooks Realty, Inc., hereinafter called Realty, and the contents of the building were owned by Brooks Upholstering Company, Inc., hereinafter called Upholstering, which was engaged in a furniture manufacturing business. Thirty separate insurance policies issued by 15 insurance companies covered loss from fire on the building, its contents, and for business interruption. Eight of these policies covered the building, with a maximum protection of $250,000. Proofs of loss for the building, its contents, and for business interruption were duly filed, and all claims were rejected by the insurance companies on the grounds that the building was destroyed by arson and that the risk of loss had been increased as a result of facts that will be hereinafter related.

Both corporations were almost entirely owned and managed by the Brooks family. Mrs. Esther Brooks, aged 79 at the time of the trial, was president and treasurer of Realty and owned over half of the out-

standing voting stock. Other shares were owned by her daughter, Ruth Brooks, who was secretary of Realty, and her sons, Milton Brooks and Edward Brooks. Esther Brooks owned a few shares as trustee for the children of Edward Brooks. Edward Brooks was vice president and had the final decision in corporate affairs. Esther's husband, Albert Brooks, owned one share but took no part in the business. Nonvoting stock of Realty was also owned by Esther Brooks for Edward Brooks' three children and by Milton and Ruth Brooks. Esther, Albert, Ruth, Edward, and Milton Brooks constituted the board of directors of Realty.

Edward Brooks owned half of Upholstering and was chief executive officer. The only nonfamily member of the corporation was Donald Fairley, who in 1960 became president of Upholstering, succeeding Edward Brooks, who thereafter was chairman of the board of directors. Esther Brooks was treasurer and owned about 30 percent of Upholstering stock. Ruth Brooks, who was secretary, and Milton Brooks owned most of the remaining shares, a few being owned by Albert Brooks. Except for Milton, who was not a director, the above were directors of Upholstering.

The two corporations maintained joint offices in the building which burned. The books of Realty were kept in a safe in Mrs. Esther Brooks' office in the building, which office she shared with Edward Brooks. Esther did not do any active work in the office but was present in a consulting capacity, merely so that her advice could be asked on certain matters. She would come to the office around 9:30 or 10 a. m. and leave at 2 or 2:30 p. m. Edward Brooks testified that she would greet customers and sign checks, as well as open the mail.

One of the employees of Upholstering, Charles R. Rottach, also served Realty in the upkeep of the building. He was the maintenance and boilerman and directly in charge of the sprinkler system intended to protect the building, its contents, and the business against loss by fire. It was his responsibility to get the sprinkler system fixed if something went wrong with it. He was also responsible for locking the building on Saturdays, and he would fix windows and doors in the building when they needed fixing.

As a result of the fire three separate actions were started — one by Realty to recover for damage to the building; a second by Upholstering to recover for loss of the contents of the building; and a third by Upholstering to recover for business-interruption loss. Motions were made to consolidate the three actions but they were denied by the trial court. The action brought by Realty went to trial first. The jury found that (1) plaintiff did not intentionally set the fire; (2) plaintiff did not intentionally increase the risk of loss by fire; (3) the building was not a total loss; and (4) plaintiff's damages from the partial loss did not exceed $250,000, and assessed plaintiff's damages at $122,600.

Thereafter, post-trial motions were made for judgment notwithstanding the verdict or for a new trial by defendants. Plaintiff moved for judgment for the face amount of the policies notwithstanding the verdict.

While these motions were pending, Charles R. Rottach, who at the trial had testified that he had accidentally knocked the head off one of the sprinklers and had thereafter shut off the sprinkler system but that the officers of the company knew nothing about this, recanted and said he had lied during the trial; that he had informed Edward Brooks, as well as Don Johnson, his superior, that the sprinkler system had been shut off, and had been told by Mr. Brooks not to have it fixed. Thereupon the motion for judgment notwithstanding or for a new trial was amended so as to allege newly discovered evidence. In the meantime the suit brought by Upholstering for loss of the contents of the building went to trial. The jury there found that plaintiff did not intentionally set the fire but that it did intentionally increase the risk of loss, and returned a verdict for defendants. In that trial Rottach testified substantially as he had deposed after the first trial. These matters will be more fully discussed later. The trial court in the Realty case denied the motion of defendants for judgment notwithstanding the verdict and granted plaintiff's motion for judgment for the full amount of the policies, also providing that if its order were reversed, a new trial would be granted on the issue of damages only. While the court did not specifically rule on defendants' motion for new trial on all issues, denial of that motion

is implicit in the order granting a new trial on the issue of damages only.

So far as we know the action for damages due to business interruption has not yet been tried.

Essentially the questions for review here are: (1) Did the court abuse its discretion in denying a new trial, on the grounds of newly discovered evidence based on the recantation of Rottach's testimony after the trial? (2) Did the court err in setting aside the jury's verdict and granting judgment notwithstanding for the full amount of the policies or, if that action were reversed, a new trial on the issue of damages only? (3) Did the court err in denying defendants' motion for new trial based upon errors in the rejection or admission of evidence that will later be discussed?

The appeals in the Realty and Upholstering cases were consolidated for hearing here but will be discussed in separate opinions except in so far as they relate to each other.

■ Ordinarily, the granting or denial of a new trial based on the recantation of testimony of a witness is left to the trial court and will not be reversed on appeal unless it appears that the testimony is of such a serious nature that a different result is almost sure to follow if the testimony had been as the witness, after the trial, says it should have been. While no definite rule is available on this subject and the courts are not at all in harmony as to what should be the result, it is apparent that each case must stand or fall on its own facts.[1]

The Minnesota law on the subject of granting a new trial upon the grounds of newly discovered evidence based upon the perjured testimony of witnesses is to be found in 14 Dunnell, Dig. (3 ed.) § 7127b.

A somewhat analogous criminal case is State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, where one of the main witnesses after

---

[1] For discussions on the analogous subject of perjury as ground for relief against a judgment, see 12 Cornell L. Q. 385; Note, 10 L.R.A. (N.S.) 216. For annotations on the subject of recantation of witnesses as grounds for new trial in criminal cases, see 33 A. L. R. 550, 74 A. L. R. 757, and 158 A. L. R. 1062; and for an annotation on recantation of witnesses as grounds for a new trial in civil cases, see 10 A. L. R. (2d) 381.

trial confessed that he had committed perjury. In that case a hearing was held before the trial judge in which the witness was examined, and, based upon the examination, the court concluded that the witness had told the truth in the first place. In the instant case the court denied defendants' application to have Rottach testify under oath before the trial court and made his decision upon the basis of a statement taken outside the presence of the court. As a result, the court did not have the benefit of the witness' appearance and demeanor at the time he made his recantation. We think it would have been better if the court had allowed the application.

In considering whether the court abused its discretion in denying a new trial on the ground of Rottach's recantation, we must keep in mind the nature of the statements made after the trial. At the trial Rottach testified that a few days before the fire he knocked a sprinkler head off and then turned off the main valve, and that same day he told his superior, Don Johnson, the mill foreman, what he had done and Johnson replied, "Get the damn thing fixed." Rottach testified that he did not tell anyone else, and specifically that he did not tell Edward Brooks until after the fire that he had shut down the sprinkler system. Edward Brooks testified that he did not know until after the fire that the sprinkler system had been shut down.

About one year after the trial, while the trial court had pending plaintiff's and defendants' post-trial motions, Rottach called defendants' counsel and made an appointment to see him. He then confessed that he had lied at the trial. The trial court was notified, as was the Hennepin County attorney and opposing counsel, and Rottach's signed statement was taken. In the statement Rottach gave to defendants' counsel he said that he did tell Edward Brooks before the fire of the crippling of the system and Brooks told him, "We have got enough bills now, Bud. * * * Leave it go for a while; we'll get it fixed later * * *. The building has been here fifty years and it will be here another fifty years." Rottach also stated that about 2 weeks before the fire Edward Brooks came to him and while they were alone said, "Bud, you know that we'll be broke and file bankruptcy in a few weeks and you'll be out of a job." Rottach said he responded, "Gee, I didn't know that,"

and that Edward Brooks then said, "Would you mind setting a small fire for me?" Rottach said he answered, "Hell, no," and walked away.

Rottach also said in his statement that prior to the above occurrences he had entered Don Johnson's office as Donald Fairley and Edward Brooks were leaving, and Johnson said to him, "Hey, Bud, do you want to make some money" or "Do you want to make a few thousand dollars" or something like that. Rottach said, "What's the matter; now what do I got to do?" and Johnson replied, "The big wheels just walked out of here and they wished the damn place would burn down." Rottach said he asked, "Is business that bad?" and Johnson replied, "Man, they're crying."

Rottach also said in the statement that Brooks tried to get Rottach to conceal the fact that he had informed Brooks that the sprinkler system was out of order and that he promised "to take care of him."

Apparently the trial court was of the opinion that the post-trial statement was unreliable because Rottach had been attempting to extort money from Brooks, and, failing in that, was seeking revenge of some kind. Rottach was charged with perjury, entered a plea of guilty, and was sentenced to the State Prison at Stillwater, where he served part of his time.

Much the same situation exists here as exists when a juror states after the verdict that something was wrong with the deliberation. In Schwartz v. Minneapolis Suburban Bus Co. 258 Minn. 325, 104 N. W. (2d) 301, we stated what we thought was the better practice when that happens. If under those circumstances a juror is to be examined, it ought to be done before the court, where a record can be made. The same rule should apply to examination of a recanting witness. Thus the trial court, with whom is left a large discretion in determining whether a new trial should be granted, will have the benefit of observing the witness both at the time of trial and at the time of the recantation.

There are foreign cases pro and con on this subject, but we see no need of discussing them. They are amply annotated in the references above. Even though the procedure followed here probably was not the

best, if that were all that was involved in this case, we would be inclined to follow the trial court's determination that the recantation of Rottach, standing alone, is not sufficient to warrant a new trial.

It must be said that when this situation developed counsel for both parties commendably acted as attorneys should. Rottach's recantation was reported to the county attorney and trial judge, as well as to opposing counsel. We fully agree with the following statements of the trial judge in the later Upholstering case:

"* * * The attorneys made it very clear, I thought, and the record is very clear that neither office is involved in any shenanigans whatever. Both counsel protected themselves like gentlemen. Both notified the County Attorney. The one point he has never changed on is that he has never claimed at any time that any of the attorneys has tried any fancy business with him. That's one thing he has been consistent on. He has never at any time involved anybody in either firm. There has been no involvement whatsoever shown on the part of either of you."

■ Did the trial court err in setting aside the verdict of the jury and in ordering judgment against the defendants for the full amount of the insurance coverage? This presents a more difficult problem. Minn. St. 65.05 reads in part:

"* * * In the absence of any change increasing the risk, without the consent of the insurer, of which the burden of proof shall be upon it, and in the absence of intentional fraud on the part of the insured, the insurer shall pay the whole amount mentioned in the policy or renewal upon which it receives a premium, in case of total loss, and in case of partial loss, the full amount thereof."

Certain rules have evolved over the years in applying our statutory provisions. These rules are not difficult in the abstract but their application to different fact situations can be difficult. Thus it is clear that if the building is totally destroyed, the insured recovers the stated value in the policy, without reference to actual value. If it is partially destroyed, the insured recovers the actual loss, whatever that is. If the evidence conclusively establishes that the actual loss is more than the insurance, it is proper to direct a judgment for the full amount of the in-

surance. The latter statements, supported by Ohage v. Union Ins. Co. 82 Minn. 426, 85 N. W. 212; Moore v. Sun Ins. Office, 100 Minn. 374, 111 N. W. 260; and Moore v. Phoenix Ins. Co. 100 Minn. 393, 111 N. W. 263, were relied upon by the trial court. These cases must be distinguished from a case where the evidence is not conclusive. In Oppenheim v. Fireman's Fund Ins. Co. 119 Minn. 417, 423, 138 N. W. 777, 780, we said:

"* * * It is quite evident, furthermore, from this statute [the predecessor of § 65.05], and from other provisions of the law and of the standard form of policy, * * * that it was intended that in case of a total loss on buildings the recovery shall be on the basis of the insurable value as stated in the policy, but that in the case of a partial loss on buildings, or a total or partial loss on other property, the amount of the loss shall be recovered, without reference to the insurable value as stated in the policy."

The difficulty in applying these rules arises in determining what the actual loss is where a building is partially destroyed.

■ In determining "actual cash value" of property under insurance policies, three rules have evolved over the years, each supported by respectable authority. See, Annotation, 61 A. L. R. (2d) 711. The first is that actual market value at the time of destruction shall control. The second is that the replacement or reproduction costs shall control. The third, which has been denominated as the "broad evidence rule," seems to find favor of recent years with most courts. Under it, the court will receive any evidence logically tending to establish the actual cash value. The same rule ought to apply in determining loss in case of partial destruction of a burned building. In Oppenheim we said (119 Minn. 425, 138 N. W. 780):

"* * * The question of whether the loss was total or partial should have been submitted to the jury, with instructions to return a verdict for the full amount of the policy in case the loss was found to be total, but if the loss was found to be partial, and less in amount than the total insurance, to return a verdict for the defendant. If the actual loss, though partial, was found to be greater than the amount of the insurance, how-

ever, the plaintiffs would be entitled to a verdict for the full amount of the policy under the rule in the Ohage case.

"In determining the actual amount of a partial loss, the insurable value as stated in the policy should not be used as a basis, but the question should be decided upon the evidence before the jury that tends to prove what is the amount of the actual loss and damage sustained by the insured from the fire, the actual value of the building at the time of the fire, cost of reconstruction, cost of removing the debris, amount of salvage, all being proper subjects of inquiry."

In setting aside the verdict of the jury, the trial court seems to have adopted the rule of reproduction or replacement cost only. In the court's memorandum we find the following:

"* * * The undisputed evidence is that the cost to repair exceeded the amount of the coverage."

In the leading case [2] of McAnarney v. Newark Fire Ins. Co. 247 N. Y. 176, 184, 159 N. E. 902, 904, 56 A. L. R. 1149, 1154, the New York court said:

"Indemnity is the basis and foundation of all insurance law. * * * Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss. It may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject."

In an article in 29 Col. L. Rev. 857, by James C. Bonbright and David Katz, entitled *Valuation of Property to Measure Fire Insurance Losses*, the authors say (p. 899):

"In general we conclude that the opinions of the courts, especially of the appellate courts, have shown an increasing desire to make the

---

[2] See, Annotation, 61 A. L. R. (2d) 719.

measure of recovery for fire insurance losses correspond to the actual loss sustained by the insured in view of all of the circumstances of the case. To put the matter in other words, the courts, when faced with a choice between applying some standardized rigid rule such as replacement cost minus physical depreciation or of adopting some more flexible test which can be modified in such a way as to accord more nearly with the principle of indemnity, have generally preferred the latter alternative even though it has involved the sacrifice of administrative convenience and of simplicity."

It is true that if we limit our inquiry to the cost of reproduction or replacement only, the trial court was in all probability correct. However, there was evidence of the value of the building that the jury could consider. The jury was not bound entirely by the opinion of plaintiff's experts. It found there was a partial destruction and it did return a verdict for less than the full amount of the policies. These were jury questions. Some of the evidence which was rejected would have helped to establish the value of the building, which was one of the items that the jury could properly have considered in determining what the loss actually was.

■ In effect the trial court instructed the jury on the broad-evidence rule in the following language:

"* * * In determining the amount of damages, if you find the loss is partial and not total, you will consider the actual value of the building at the time of the fire, the cost of reconstruction, the cost of removing the debris, the amount of salvage, and any other factors indicated by the Court, and apply to them your common sense and your knowledge and your experience in life. In determining the reasonable cost of reconstruction, restoration, or repairing, you should take into account all of the facts and circumstances shown in evidence as to the condition of the building before the fire, and its condition after the fire. You also have a right to consider the testimony in the case as to the cost of reconstructing and repairing the building. The opinion expressed by any witnesses to the cost of reconstructing or repairing is not binding upon you. You must determine the cost of restoration, reasonable cost

of restoration, from all of the facts and circumstances shown in evidence, of which these opinions are but a part."

The trial court then, on motion of plaintiff, nullified everything he had said in his instructions by holding that the cost of replacement or restoration was the sole criterion; and contrary to his instructions to the jury, he based this decision entirely upon the opinion of experts.

Inasmuch as the trial court granted a new trial on the issue of damages, if we reverse the order granting judgment for the full amount of the policy, we have a choice of reinstating the jury verdict or, due to the other matters discussed here, of granting a new trial on all issues. We choose the latter course.

Other errors assigned by defendants deal mainly with the reception or rejection of evidence. They may or may not arise again on a new trial. Some of them in all probability will not, because they deal with alleged refusal of the trial court to permit defendants to cross-examine witnesses upon a claim of surprise. There will be no surprise in another trial, as they now know the position of the witnesses. While we think the court might have permitted defendants more latitude in allowing John Kennedy opportunity to express an opinion as to the cause of the fire, which in a proper case is permissible if the qualification of the expert is sufficiently established, Nathan v. St. Paul Mutual Ins. Co. 251 Minn. 74, 86 N. W. (2d) 503, we have in mind the usual rule that the qualification of an expert is a matter resting largely in the discretion of the trial court. Teslow v. Minneapolis-Honeywell Regulator Co. 273 Minn. 309, 141 N. W. (2d) 507. Aside from the propriety of ruling on the admission of evidence, which we refrain from discussing here, the alleged errors relate largely to the court's instructions and refusal to give instructions dealing mainly with imputation to Realty of knowledge of the officers and agents of Upholstering. We need not delve too deeply into this because, if the jury believes Rottach's latest testimony, Edward Brooks himself had knowledge clearly imputable to both companies. On the other hand, knowledge of an officer or agent of one corporation having no connection with the other would clearly not be imputable to the corporation with which he was not connected. We think defendants' contentions in this area deal more with semantics

than realities, and that the trial court on a new trial will have no difficulty in properly instructing the jury.

Looking at the whole matter now, retrospectively, it is our opinion that denial of the motion to consolidate the three cases for trial on the issue of liability was an abuse of judicial discretion. In the trial of the liability issue, the evidence of all three cases will be the same and the result ought to be the same. The result of the two cases tried is so perverse that it ought not to be repeated.

Reversed and new trial granted on all issues.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.